# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| VIVIAN CASPER, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| GENEVIEVE WEST, in her official capacity | § | |
| as Chair of Department of Language, | § | |
| Culture, & Gender Studies; ABIGAIL | § | |
| TILTON, in her official capacity as Dean of | § | |
| the College of Arts & Sciences; CARINE | § | Civil Action No. 4:23-cv-42 |
| FEYTEN, in her official capacity as | § | Judge Mazzant |
| Chancellor and President; ANTHONY | § | |
| YARDLEY, in his official capacity as | § | |
| Director of Employee Relationships, HR | § | |
| Compliance & Equity; and KATHERINE | § | |
| ANTWI GREEN, in her official capacity as | § | |
| General Counsel, Secretary of the Board of | § | |
| Regents, and Chief Compliance Officer, | § | |
| | § | |
| *Defendants.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendants' Motion to Dismiss (Dkt. #16) and Supplement to Defendants' Motion to Dismiss (Dkt. #31). Also pending before the Court is Plaintiff's Opposed Motion for Leave to File Second Amended Complaint (Dkt. #33). Having considered the Motions, the relevant pleadings, and the applicable law, the Court finds as follows:

1. Defendants' Motion to Dismiss (Dkt. #16) should be **GRANTED in part** and **DENIED in part**.

2. Plaintiff's Opposed Motion for Leave to File Second Amended Complaint (Dkt. #33) should be **GRANTED.**

## BACKGROUND

### I.    Factual Background

This is a First Amendment retaliation case arising out of Plaintiff Vivian Casper's ("Casper") suspension from active professorial duties at Texas Women's University ("TWU"). In short, after Casper made particular remarks at an October 2022 faculty meeting, some controversy ensued, and Defendants[1] suspended her from further service pending an investigation. Casper alleges that during the faculty meeting, she was cut off from speaking after she began to express her viewpoint on "wokeism"[2] (Dkt. #12 at p. 1). According to Casper, she was later suspended from her professorial duties after she sent an email to her colleagues clarifying her position on the matter (Dkt. #12 at pp. 1–2).

At the time of filing, Casper was an 85-year-old tenured associate professor at TWU in the Department of Language, Culture & Gender Studies (Dkt. #12 at p. 2). She was hired in 1969 and achieved tenured status in 1978 (Dkt. #12 at p. 4). According to Casper's Complaint, she has an "extensive history of exceptional service at the University" (Dkt. #12 at pp. 4–6). In support, she cites her overall rating of "Effective" in her Spring 2022 Post-Tenure Performance Review (Dkt. #12 at p. 4). She claims to have maintained positive working relationships with her colleagues and students throughout her career at TWU (Dkt. #12 at pp. 5–6).

---

[1] As defined in Casper's Amended Complaint (Dkt. #12), Defendants are (1) Genevieve West, the Chair of the Department of Language, Culture, & Gender Studies; (2) Abigail Tilton, the Dean of the College of Arts & Sciences; (3) Carine Feyten, the Chancellor and President of the University; (4) Anthony Yardley, the Director of Employee Relations, HR Compliance & Equity; and (5) Katherine Antwi Green, General Counsel, Secretary to the Board of Regents, and Chief Compliance Officer for the University. The Court will refer to them collectively as "Defendants."

[2] Casper's Amended Complaint defines "wokeness" as "being alert to and concerned about social injustice and discrimination" (Dkt. #12 at ¶ 34). Casper believes "wokeness" to be a controversial topic in college campuses across the country (Dkt. #12 at ¶ 34).

Casper contends that in early 2021, Defendants began to further a "woke ideology" and began to "chastise" Casper for not personally adopting that ideology (Dkt. #12 at p. 7). Specifically, Casper claims that Defendants "made a blatant attack on [her] right to freedom of speech" after she attempted to help a student who was struggling in her Fall 2020 English course (Dkt. #12 at p. 7). According to Casper, she encouraged the struggling student by telling her that "if she continued to work hard she would succeed" (Dkt. #12 at p. 7). Casper asserts that, in response to her alleged encouragement, Defendants accused Casper of racial discrimination, removed her from most of her roles with TWU, and suspended her from teaching (the "2021 Suspension") (Dkt. #12 at p. 7). In October of 2022, TWU released the Spring 2023 semester course schedule (Dkt. #12 at p. 8). TWU did not give Casper any classes to teach (Dkt. #12 at p. 8).

Casper filed a separate action against TWU pertaining to the 2021 Suspension in Texas state court (Dkt. #16-2). The 431st District Court of Denton County, Texas, dismissed the case after granting TWU's plea to the jurisdiction on sovereign immunity grounds. The Fort Worth Court of Appeals affirmed the trial court's dismissal. *See Casper v. Tex. Women's Univ.*, No. 01-22-00345-CV, 2023 WL 5617129 (Tex. App.—Fort Worth, Aug. 31, 2023, pet. denied).

Then, in October of 2022, Casper attended a TWU faculty meeting with her colleagues (Dkt. #12 at p. 8). She contends that, during the meeting, another faculty member made statements that "indicated 'wokeness'" (Dkt. #12 at p. 8). Casper contends that she responded to her colleague that she "should read more" (Dkt. #12 at p. 8). Then, she claims that Genevieve West ("West"), her supervisor, cut her off (Dkt. #12 at p. 8). Casper adds that she was planning to speak more about "wokeness" had West not interrupted her (Dkt. #12 at p. 8). When West asked Casper to clarify what she meant when Casper said "you should read more," Casper did not respond (Dkt.

#12 at p. 8). After the meeting concluded, Casper sent an email to both West and the faculty member "explaining her position on 'wokeness' or 'wokeism'" (Dkt. #12 at p. 8). Casper alleges that it was this expression of a "disfavored viewpoint" that led to another suspension, pending completion of an investigation, from service on faculty committees at TWU (Dkt. #12 at pp. 9–10). More than a year after Defendants launched their investigation, Casper received a letter from West on December 11, 2023, that informed her of the investigation's conclusion and notified her that her committee service had been restored (Dkt. #31-1).

## II.    Procedural History

On January 13, 2023, Casper filed her Original Complaint against Defendants, asserting claims for violations of Casper's First Amendment Right to Freedom of Speech under 42 U.S.C. § 1983 for retaliation and both content and viewpoint discrimination, as well as age discrimination claims under 29 U.S.C. §§ 621–634 (Dkt. #1). Her Complaint requests declaratory and injunctive relief (Dkt. #1). On May 1, 2023, Casper amended her Complaint, abandoning the age discrimination claims but maintaining her § 1983 claims (Dkt. #12). Her Complaint, as amended, brings claims against Defendants in both their individual and official capacities (Dkt. #12).

On May 30, 2023, Defendants filed their Motion to Dismiss under Rules 12(b)(1) and 12(b)(6) (Dkt. #16). Defendants' 12(b)(1) Motion asserts that Casper's claims are jurisdictionally barred by sovereign immunity (Dkt. #16 at pp. 7–12). Their 12(b)(6) challenge contends that Casper has not plausibly alleged the elements of her First Amendment claims and that her individual capacity claims are not cognizable (Dkt. #16). As it relates to Casper's individual capacity claims, Defendants submit that (1) Defendants did not possess the requisite authority in their individual capacities to take actions related to their university roles and responsibilities, and (2) Casper's

individual capacity claims must fail because she seeks injunctive relief only in the form of ordering Defendants to take actions pursuant to those roles (Dkt. #16).

On June 13, 2023, Casper filed her Response to Defendants' Motion to Dismiss and Brief in Support (Dkt. #19). Her Response did not address Defendants' individual capacity argument (Dkt. #19). On June 20, 2023, Defendants replied (Dkt. #21). The Reply asserts, among other things, that Casper's failure to contest Defendants' argument that her individual capacity claims were barred constituted abandonment of those claims (Dkt. #21 at pp. 2–3). On July 18, 2023, Casper filed a Sur-Reply to Defendants' Motion to Dismiss and Brief in Support (Dkt. #26). Again, she did not address Defendants' abandonment contention (*See* Dkt. #26). On March 7, 2024, Defendants filed their Supplement to Defendants' Motion to Dismiss, which asserts that the conclusion of the investigation—which restored Casper to committee service—renders her claims moot (Dkt. #31). On March 21, 2024, Casper filed her Response in Opposition to Defendants' Supplement to their Motion to Dismiss (Dkt. #32). Finally, on March 21, 2024, Casper filed her Opposed Motion for Leave to File Second Amended Complaint (Dkt. #33). Through it, Casper seeks to amend her Complaint to add nominal damages against the Defendants in their individual capacities and to add factual allegations addressing Defendants' mootness challenge (Dkt. #33). On April 4, 2024, Defendants filed their Response in Opposition to Plaintiff's Motion for Leave to Amend (Dkt. #38).

## LEGAL STANDARD

### I.     Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes a district court to dismiss a case for lack of subject matter jurisdiction when the court lacks statutory or constitutional power to adjudicate

the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court will consider the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In deciding whether to dismiss an action for want of jurisdiction, the Court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). The Court will accept as true all well-pleaded allegations set forth in the complaint and construe those allegations in the light most favorable to the non-movant. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). Once a defendant moves to dismiss under Rule 12(b)(1) and challenges jurisdiction, the party invoking jurisdiction has the burden to establish subject matter jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). The Court will grant a motion to dismiss for lack of subject matter jurisdiction only if it appears certain that the claimant cannot prove a plausible set of facts to support a claim that would entitle it to relief in this judicial system. *Lane*, 529 F.3d at 557.

## II.    Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a) requires that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citation omitted). This

7

evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

## ANALYSIS

### I.    Introduction

In addition to their 12(b)(1) Motion, Defendants raise four grounds for dismissal in their Motion to Dismiss (Dkt. #16). First, Defendants assert that Casper has not suffered a materially adverse employment action as required to support a First Amendment retaliation claim (Dkt. #16 at pp. 12–14). Second, Defendants maintain that Casper's First Amendment retaliation claim fails because she did not speak as a private citizen on a matter of public concern (Dkt. #16 at pp. 14–15). Third and relatedly, Defendants submit that because Casper did not speak as a private citizen on a matter of public concern and her case does not implicate academic freedom, her First Amendment claims asserting content and viewpoint discrimination must also fail (Dkt. #16 at pp. 12–17, 19–21). Fourth and finally, Defendants allege that *res judicata* bars Casper's claims related to her prior administrative leave from teaching duties because those claims were the subject of a previously dismissed state court lawsuit (Dkt. #16 at pp. 21–23).

But before the Court can reach the merits of Defendants' Motion, the Court must first decide whether it has constitutional authority to adjudicate the case. *See Ramming*, 281 F.3d at 161. Defendants raise a two-part challenge to the Court's jurisdiction over this action (Dkt #16 at pp. 7–12; Dkt. #31). First, Defendants argue that Casper's claims are moot because Casper has been

restored to committee service now that the investigation is complete (Dkt. #31 at p. 1). Second, Defendants contend that Casper's official capacity claims against the TWU officials are barred by sovereign immunity because the *Ex parte Young* exception does not apply (Dkt. #16 at pp. 7–12). The Court begins its analysis by answering these threshold jurisdictional questions in turn.

## II.     Rule 12(b)(1) Subject Matter Jurisdiction

### A.     Mootness

The threshold issue before the Court is whether Defendants' voluntary cessation of the challenged conduct—namely, restoring Casper to committee service following the conclusion of the University's investigation—is sufficient to render moot all of Casper's claims. The Court finds that it is not.

Article III of the United States Constitution limits federal court jurisdiction such that it may hear only "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. The Supreme Court has interpreted this limitation to require that "'a justiciable case or controversy . . . remain extant at all stages of review, not merely at the time the complaint is filed.'" *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 609 (2013) (quoting *United States v. Juvenile Male*, 564 U.S. 932, 936 (2011)). When a controversy no longer presents a live issue "or the parties lack a legally cognizable interest in the outcome," the case becomes moot. *Powell v. McCormack*, 395 U.S. 486, 496 (1969). As a result, "[a] case that becomes moot at any point during the proceedings is 'no longer a Case or Controversy for purposes of Article III,' and is outside the jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 584 U.S. 381, 385–86 (2018) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotations omitted)).

Sometimes, at first blush, an issue may appear moot. Yet constitutional jurisprudence regarding mootness has evolved to develop exceptions that sometimes block its application. One such exception is voluntary cessation. Generally, under the voluntary cessation doctrine, a defendant's voluntary cessation of a challenged practice will not strip a court of its power to determine the legality of the practice. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 169–70 (2000) (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). Indeed, "[a] case does not necessarily become moot when a defendant voluntarily ceases the objectionable conduct." *Texas v. E.E.O.C.*, 933 F.3d 433, 449 (5th Cir. 2019). "If it did, courts would be compelled to leave the defendant free to return to its old ways." *Friends of the Earth*, 528 U.S. at 170. But a defendant's voluntary cessation can still render a claim moot only if the defendant can show that it will not repeat the offensive conduct. *Texas v. E.E.O.C.*, 933 F.3d at 449. To do so, the defendant bears a heavy burden to "show that subsequent events made it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (emphasis added). In determining whether the defendant has carried its burden, the Court "takes into account the totality of the circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 768 (6th Cir. 2019).

The voluntary cessation exception applies to this case, even though Casper seeks only injunctive and declaratory relief. Indeed, "'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice,' *even in cases in which injunctive relief is sought.*" *Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020) (quoting *Meza v. Livingston*, 607 F.3d 392, 399–400 (5th Cir. 2010) (emphasis added)). In some cases, the Fifth Circuit has "'treated voluntary governmental cessation of possibly wrongful

conduct with some solicitude . . . .' " *Id.* (quoting *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas*, 563 U.S. 277 (2011)). But in *Fenves*, the Fifth Circuit expressly declined to adopt that "relaxed standard" and apply it to public universities, although it assumed its applicability *arguendo* for purposes of the case. *Id.* Instead, the court adopted the Sixth Circuit's framework for determining whether wrongful government conduct is likely to recur in the university context. *Id.* (citing *Schlissel*, 939 F.3d at 767–70). The Court starts with the "presum[ption] that the same allegedly wrongful conduct by the government is unlikely to recur." *Id.* The presumption of mootness can be defeated on three independent bases: "(1) the absence of a controlling statement of future intention; (2) the suspicious timing of the change; and (3) the university's continued defense of the challenged policies." *Id.* Just as the Fifth Circuit in *Fenves* concluded that each of these three reasons were independently sufficient to defeat the presumption of mootness, here, the Court concludes the same. *See id.* at 329. The Court will address each in turn.

*First*, the officials have not released any controlling statement of future intention. *See id.* at 328. Defendants insist that Casper's claim is moot because, on December 11, 2023, West sent a letter to Casper announcing TWU's decision to conclude the investigation into her conduct (Dkt. #31 at pp. 3–4; Dkt. #31-1). But the Fifth Circuit requires more. To qualify as a "controlling statement," the Fifth Circuit looks to " 'evidence in the record that [the person making a statement] . . . has control over whether the University will reimplement the challenged' " conduct. *Fenves*, 979 F.3d at 328–29 (quoting *Schlissel*, 939 F.3d at 769). Here, the record contains no such evidence. As far as the Court can tell, the only apparent "controlling statement" is from the December 11, 2023, letter, which provides:

11

> This letter serves to inform you that the above referenced investigation has concluded. The pause on your service on university committees has been lifted. You may now serve on university committees, consistent with college and departmental procedures and guidelines.

(Dkt. #31-1). All this statement represents is TWU's then-existing announcement that it concluded its investigation into Casper's conduct. The statement is silent as to the University's *future* intentions. Further, there is no evidence in the record suggesting that West controls whether TWU will reimplement Casper's suspension during or after her tenure. *See Fenves*, 979 F.3d at 329 (finding that a university president's statement that "the University has no plans to, and will not, reenact the former policies" was not a controlling statement of future intention because there was no evidence that the president controls whether the university will reimplement the challenged policies). Consequently, the statement in West's December 11, 2023, letter to Casper is not a controlling statement of future intention. *See id.*

*Second*, the timing of the investigation's conclusion similarly cuts against the presumption of mootness. On November 4, 2022—less than one month after Casper's statement on "wokeness"—TWU informed Casper that she was suspended pending the outcome of an investigation into her conduct (Dkt. #12 at pp. 8–10). On January 13, 2023, while the investigation was pending, Casper filed her Complaint in this case (Dkt. #1). The University's investigation lasted more than a year, finally concluding on December 11, 2023 (Dkt. #31-1). But as Casper observes, Defendants' decision to end Casper's suspension arose "just as they were appealing a district court judgment rejecting their plea to the jurisdiction in a separate case brought by Casper in state court" for age discrimination (Dkt. #32 at pp. 3–4).

Defendants attempt to brush off the suspicious timing of the investigation's conclusion by distinguishing *Fenves* from the facts here (Dkt. #35 at p. 2). Defendants attempt to distinguish

12

*Fenves* from this case on three grounds (Dkt. #35 at p. 2). First, Defendants note that the University's investigation commenced before Casper filed her Complaint (Dkt. #35 at p. 2). Second, Defendants observe that the University issued its final decision before the Court's ruling (Dkt. #35 at p. 2). Third, Defendants add that the University issued its decision to lift Casper's suspension in a letter to Casper outside of court proceedings (Dkt. #35 at p. 2). According to Defendants, the facts in *Fenves* are as similar to the facts in this case as "a tyrannosaurus to a gecko" (Dkt. #35 at p. 2). Therefore, Defendants urge the Court not to rely on *Fenves* (Dkt. #35 at p. 2). Defendants' argument has some merit. But ultimately, it misses the mark. Unlike here, in *Fenves*, the University did not commence its investigation or amend its policies until the district court rendered its decision and the case was pending appeal. 979 F.3d at 329. Indeed, the facts underlying the Fifth Circuit's decision in *Fenves* are distinct from these facts, but not so distinct as to take this case out of the Cretaceous Period.[3]

Metaphors aside, *Schlissel*, from which the Fifth Circuit adopted the test it used in *Fenves*, is a better analog. *See* 939 F.3d 756. There, the challenged conduct at issue involved the University of Michigan's definitions of "bullying" and "harassing" on its website, which the plaintiff argued were overbroad and vague, sweeping in protected speech. *Id.* at 762. There, like here, the University ceased its challenged policies (by updating the definitions) only after the complaint was filed. *Id.* at 769. And like the investigation here, the University in *Schlissel* updated the definitions after the culmination of a review process that preceded the litigation. *Id.* Yet still, because the court was not

---

[3] The Cretaceous Period is a geologic time period within the Mesozoic Era that began 145 million years ago and ended 66 million years ago and was dominated by dinosaurs, including tyrannosaurus rex, which roamed the western United States nearly 70 million years ago. BRITANNICA, https://www.britannica.com/science/Cretaceous-Period (last updated Jan. 29, 2025); *Tyrannosaurus rex, Fact Sheet*, SMITHSONIAN (Apr. 1, 2014), https://www.si.edu/newsdesk/factsheets/tyrannosaurus-rex.

convinced that the review would have necessarily resulted in the amendment to the definitions on the website, the fact that the review began before the plaintiff filed its complaint did not allow the University to escape liability based on mootness. *Id.*

The same holds true here. Defendants' argument that Casper's renewed committee service renders her claims moot assumes that the University's cessation of the investigation was genuine (Dkt. #31 at p. 1). Notably, Casper challenges the constitutionality of the investigation itself and seeks equitable relief to ensure that the University will not take additional action based on the result of the investigation (Dkt. #12 at p. 17). As it stands now, the record lacks any evidence about the adequacy of the University's investigation or its basis for suddenly lifting Casper's suspension after more than a year. Further, Defendants do not "'explain the expedient timing of [the investigation's conclusion].'" *Fenves*, 979 F.3d at 329 (quoting *Schlissel*, 939 F.3d at 770). If anything, this increases TWU's burden to prove that its cessation is genuine. *See Schlissel*, 939 F.3d at 769 (citing *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 713 (6th Cir. 2016)). Consequently, the fact that TWU's investigation into Casper's conduct predated this litigation "does not buttress the legitimacy of the University's actions." *See id.*

*Third* and finally, Defendants continue to defend their decision to suspend Casper pending the outcome of their investigation. In their Motion to Dismiss, Defendants submit that they suspended Casper because of "*how* she presented her disagreements (and viewpoints) during faculty meetings, not her disagreements or viewpoints themselves" (Dkt. #16 at p. 17) (emphasis in original). Throughout their Motion, Defendants remain steadfast that the University or its officials did not violate Casper's First Amendment rights (*See* Dkt. #16). To that end, Defendants continue to "defend the legality of [their] original policies." *See Fenves*, 979 F.3d at 329. As in *Fenves*,

Defendants here continue to defend the legality of their decisions, thus tipping the scale against the presumption of mootness. *See id.*

Undeterred, Defendants maintain that the record is devoid of any indication that the University intends to reopen the investigation or reinstitute the "pause" (Dkt. #35 at p. 2). But Casper's Complaint makes clear that the suspension that is the subject of this suit was not an isolated incident (Dkt. #12 at pp. 6–8). Indeed, Casper alleges a history of speech suppression by the University that extends beyond the conduct that was the subject of the November 4, 2022, letter from West (Dkt. #12 at pp. 6–8; Dkt. #16-6). Consequently, Defendants have not made it "absolutely clear" that their practice of taking disciplinary action against Casper for sharing her viewpoints will not be reinstituted. *See Texas v. E.E.O.C.*, 933 F.3d at 449; *Fenves*, 979 F.3d at 329. Hence, Casper's claims are not moot.[4]

## B.    Eleventh Amendment Sovereign Immunity

Having determined that Casper's claims are not moot, the Court must grapple with the complicated jurisdictional question of sovereign immunity. Defendants submit that Casper's claims are barred by sovereign immunity because "Texas has not waived federal court immunity

---

[4] As the Court has already stated, Casper's Motion for Leave to File Second Amended Complaint (Dkt. #33) is granted. Pursuant to Local Rule CV-7(k), Casper was required to file her proposed amended complaint contemporaneously with her request for leave. Having done so, Casper's proposed Second Amended Complaint is available on the Court's electronic docket (Dkt. #34). Thus, the Court has access to Casper's proposed amendments. Substantively, Casper only requests to make two changes (Dkt. #33). First, she requests leave to include relief of nominal damages against Defendants in their individual capacities (Dkt. #33 at p. 2). Second, she requests leave to add factual allegations addressing Defendants' assertions of mootness now that Casper has been returned to her committee service (Dkt. #33). The Court acknowledges that those factual allegations regarding mootness would, generally, weigh in a mootness inquiry. But as explained in this section, a review of Casper's First Amended Complaint (Dkt. #12), the Supplement to Defendants' Motion to Dismiss (Dkt. #31), Casper's Response (Dkt. #32), and Defendants' Reply (Dkt. #35), provides sufficient facts already to show that the claim is not moot. In any event, it is Defendants' burden to prove that Casper's claims are moot. *See Texas v. E.E.O.C.*, 933 F.3d at 449. They did not carry that burden. Casper's proposed amendments would not change the Court's analysis or holding that there is an ongoing dispute. Thus, though this Order ultimately deems Casper's Second Amended Complaint filed, Casper's Second Amended Complaint (Dkt. #34) is not susceptible to a second mootness attack on these same grounds.

from suit under civil rights statutes, and Congress has not abrogated state immunity for Section 1983 claims" (Dkt. #16 at p. 7) (citing *Aguilar v. Tex. Dep't of Crim. Just.*, 160 F.3d 1052, 1054 (5th Cir. 1998); *Quern v. Jordan*, 440 U.S. 332, 340–55 (1979)). Therefore, Casper's only hope on her official capacity claims lies with the *Ex parte Young* exception to sovereign immunity—an exception that, according to Defendants, does not apply (Dkt. #16 at pp. 7–12). The Court disagrees.

"Sovereign immunity is jurisdictional." *Cozzo v. Tangipahoa Par. Council—President Gov't*, 279 F.3d 273, 280 (5th Cir. 2002) (citing *Koehler v. United States*, 153 F.3d 263, 267 (5th Cir. 1998)). As such, before the Court can proceed any further, it must first ensure that sovereign immunity does not prevent it from presiding over the case. *Ramming*, 281 F.3d at 161.

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The outgrowth of the Eleventh Amendment is sovereign immunity, which, in short, bars private suits against nonconsenting states in federal court. *Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021) (citing *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993)). But sovereign immunity protects more than states alone. Indeed, under the Eleventh Amendment, suits against state agencies, state departments, and state officials in their official capacities are also barred. *Corn v. Miss. Dep't of Pub. Safety*, 954 F.3d 268, 273–74 (5th Cir. 2020) (internal citation omitted).

Despite the Eleventh Amendment's broad applicability, it is not without its limits. Those limits are defined in three exceptions to the general rule of sovereign immunity. *Id.* Typically, courts treat the first two exceptions together. The third stands alone. Under the first exception, sovereign

immunity does not bar a suit if "the state has waived its sovereign immunity." *Id.* at 274. Neither will it bar a suit if "Congress has clearly abrogated it." *Id.* Finally, the United States Supreme Court has carved out a narrow third exception to sovereign immunity—known as the *Ex parte Young* exception—which excepts from sovereign immunity's scope "claims for prospective relief against state officials who have been sued in their official capacities." *Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 320 (5th Cir. 2008); *Ex parte Young*, 209 U.S. 123 (1908). Defendants observe—and Casper implicitly concedes—that neither of the first two exceptions apply here (Dkt. #16 at p. 7; *see* Dkt. #19 at p. 4). The parties dispute, however, whether the *Ex parte Young* exception will save Casper's claims. To that end, the majority of Defendants' sovereign immunity briefing is dedicated to attacking Casper's invocation of the *Ex parte Young* exception (Dkt. #16 at pp. 7–12). Indeed, it is the only exception that might apply to preserve the Court's ability to hear Casper's official capacity claims. Thus, before turning to the merits, the Court's first inquiry is whether the *Ex parte Young* exception applies to allow Casper to pursue her official capacity claims against Defendants. It does and she can.

The *Ex parte Young* exception allows an individual to overcome a state actor's Eleventh Amendment immunity from suit if that suit seeks injunctive relief for alleged violations of the United States Constitution. *See Ex parte Young*, 209 U.S. 123. In the Fifth Circuit, if the *Ex parte Young* exception applies, "'[s]uits by private citizens against state officers in their official capacities are not . . . categorically barred.'" *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015) (quoting *Fontenot v. McCraw*, 777 F.3d 741, 752 (5th Cir. 2015)). Thus, "*Ex parte Young* created a narrow doorway through the sovereign immunity defense. To turn the key on the *Ex parte Young* door, a plaintiff must sue the right defendants and ask for the right remedy." *Jackson v. Wright*, 82

F.4th 362, 367 (5th Cir. 2023). Defendants argue that the *Ex parte Young* door should remain locked for Casper because she has done neither (Dkt. #16 at pp. 8–10). The Court addresses both prongs in turn.

        *1.     The Right Defendants*

The Court begins with the deceptively simple question of whether Casper has sued the "right" defendants to invoke *Ex parte Young*. To apply, the *Ex parte Young* exception allows a plaintiff to sue only state actors that have "some connection with the enforcement" of the challenged law or policy. *Jackson*, 82 F.4th at 367 (quoting *Ex parte Young*, 209 U.S. at 157). Thus, in the *Ex parte Young* context, a plaintiff sues the "right" defendant when the defendant has "some connection" with enforcing the law at issue. *See id.* Naturally, the inherent question arises: what constitutes "some connection?" The last five years of sovereign immunity jurisprudence in this circuit do not provide a clear answer. To the contrary, the term has remained largely undefined. Indeed, "[the Fifth Circuit] has struggled to define this 'connection' requirement." *Id.* (citing *Lewis v. Scott*, 28 F.4th 659, 663 (5th Cir. 2022); *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022); *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020)).

But while "[t]his circuit has not spoken with conviction"[5] on the connection requirement, "some guideposts have emerged."[6] Those guideposts steer the Court's inquiry here. *First*, the official "must have more than a 'general duty to see that the laws are implemented.'" *Tex. All. for Retired Ams.*, 28 F.4th at 672 (quoting *City of Austin v. Paxton*, 943 F.3d 993, 999–1000 (5th Cir. 2019)). *Second*, that duty must also be "the particular duty to enforce the statute in question and a

---

[5] *Tex. Democratic Party*, 978 F.3d at 179.

[6] *Tex. All. for Retired Ams.*, 28 F.4th at 672.

demonstrated willingness to exercise that duty." *City of Austin*, 943 F.3d at 1000 (internal citations omitted). The Fifth Circuit has described this second guidepost as a "provision-by-provision" analysis—"[t]he officer must enforce 'the particular statutory provision that is the subject of the litigation.'" *Tex. All. for Retired Ams.*, 28 F.4th at 672 (quoting *Tex. Democratic Party*, 978 F.3d at 179). *Third* and finally, this circuit defines "enforcement" as "compulsion or constraint." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). A "scintilla of 'enforcement' by the relevant state official with respect to the challenged law" is enough. *Tex. Democratic Party*, 978 F.3d at 179 (quoting *City of Austin*, 943 F.3d at 1002).

The Court begins its analysis by determining the requisite duty. Recent Fifth Circuit caselaw delineates between duties that are merely "general" and those that are "particular . . . to enforce the statute in question." *City of Austin*, 943 F.3d at 999–1000. The recent Fifth Circuit opinion in *Texas Democratic Party v. Abbott*, though factually dense, illustrates this distinction. 978 F.3d 168, 179 (5th Cir. 2020). That case called upon the Fifth Circuit to determine whether sovereign immunity barred a suit against three state actors: the Texas Attorney General, the Texas Secretary of State, and the Texas Governor. *Id.* at 180–81. At the heart of the dispute laid the plaintiffs' challenge to Chapter 82 of the Texas Election Code, which permits early voting by mail for voters who: (1) expect to be absent from their county of residence on election day; (2) suffer from a sickness or physical condition that prevents the voter from appearing at the polling place on election day; (3) are sixty-five or older; or (4) are confined in jail. TEX. ELEC. CODE §§ 82.001–.004. In short, Chapter 82 allows mail-in voting for any voter who is at least sixty-five but requires younger voters to satisfy certain conditions to qualify to vote by mail. *Tex. Democratic Party*, 978 F.3d at 174.

Enter the 2020 COVID-19 pandemic, which presented new and unique challenges for Texas state officials. *Id.* For his part, Governor Greg Abbott responded to the pandemic by declaring a state of disaster for Texas and postponing the May primary runoff election to July. *Id.* Then, in May, he extended the period for early voting for the July primary to ensure an efficient and safe election. *Id.* At the same time, Texas Secretary of State Ruth Hughs issued guidance regarding health and safety measures for in-person voting, which included encouraging voters to wear masks, disinfect their hands, and practice social distancing. *Id.*

In March of 2020, the Texas Democratic Party, its Chairman, and two voters initiated a Texas state court lawsuit against a county clerk. *Id.* The State intervened. *Id.* The plaintiffs sought a declaration to expand Section 82.002 of the Texas Election Code (the disability provision) to include lack of COVID-19 immunity and a person's concern about its transmission as "disabilities" for the purpose of mail-in voting eligibility. *Id.* In effect, plaintiffs pursued a reading of Section 82.002 that would allow anyone who wanted to vote by mail to do so due to a fear of contracting COVID-19. *Id.* The state court entered an injunction that barred Texas officials from "prohibiting individuals from submitting mail ballots based on the disability category" during the pandemic. *Id.* The State responded by filing a notice of interlocutory appeal, which stayed the injunction order. *Id.* at 174–75 (citing *In re Texas*, 602 S.W.3d 549, 552 (Tex. 2020)).

In May, Texas Attorney General Ken Paxton sent a letter to Texas judges and election officials. *Id.* at 175. The letter provided that "fear of contracting COVID-19 unaccompanied by a qualifying sickness or physical condition does not constitute a disability under the Texas Election Code for purposes of receiving a ballot by mail." *Id.*

A Texas Court of Appeals reinstated the initial injunction, and the State sought an emergency mandamus from the Supreme Court of Texas. *Id.* On May 27, the Supreme Court of Texas held "that a lack of immunity to COVID-19 is not itself a 'physical condition' for being eligible to vote by mail within the meaning of [Section] 82.002(a)." *Id.* (quoting *In re Texas*, 602 S.W.3d at 560).

In early April, while the state court litigation was still pending, the plaintiffs filed suit in the United States District Court for the Western District of Texas. *Id.* Among other things, the plaintiffs' complaint asserted that Texas's statute allowing mail-voting for any persons who are at least sixty-five violates the Twenty-Sixth Amendment.[7] *Id.* Applying strict scrutiny, the district court agreed and held that Section 82.003 of the Texas Election Code "violates the Twenty-Sixth Amendment, as applied, during the COVID-19 pandemic" because voters under the age of sixty-five face a disproportionate burden under the code. *Id.* The defendants appealed the injunction, and the plaintiffs defended the injunction only on the Twenty-Sixth Amendment claim. *Id.* at 176.

On appeal, the defendants invoked sovereign immunity, prompting the plaintiffs to advance an *Ex parte Young* argument. *Id.* at 178–79. Thus, the Fifth Circuit had to determine whether *Ex parte Young* applied to bar the plaintiffs' claims against Texas Governor Abbott, Secretary Hughs, or Attorney General Paxton. *Id.* 179–81. The Fifth Circuit concluded that a governor's exercise of his emergency powers to postpone a primary election and expand the early voting period did not constitute enforcement of a challenged law that he was "statutorily tasked with enforcing." *Id.* at 180. Indeed, his exercise of emergency powers was "unrelated to the Election Code." *Id.* Thus,

---

[7] The Twenty-Sixth Amendment to the United States Constitution provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. CONST. amend XXVI.

sovereign immunity insulated the governor from liability in his official capacity because the *Ex parte Young* exception did not apply to him. *See id.*

As to the Secretary of State, the court determined that the relevant statutory duty was her obligation to oversee applications for absentee ballots. *Id.* at 179. As relevant there, the Texas Election Code requires the Secretary of State to design the application form for absentee ballots, provide them to local authorities, and furnish forms for distribution to others. *Id.* at 179–80 (citing TEX. ELEC. CODE § 31.002). These responsibilities, the court reasoned, empowered the Secretary with "the authority to compel or constrain local officials based on actions she takes as to the application form." *Id.* at 180 (citing *City of Austin*, 943 F.3d at 1000). Accordingly, the court concluded that the Secretary's duties under Section 31.002 were sufficient to provide the Secretary with "at least a scintilla of enforcement authority for Section 82.003." *Id.*

That conclusion stands in stark contrast to the court's decision regarding Attorney General Paxton's connection to the challenged law. *See id.* at 181. Focusing on the letter he sent to judges and election officials, the Court concluded that because it did not threaten or indicate that enforcement of the law was forthcoming, he lacked a sufficient connection to the challenged law under *Ex parte Young. Id.*

While *Texas Democratic Party v. Abbott* is factually distinct from the one before the Court now, the Fifth Circuit has applied the same reasoning in an analogous case, *Jackson v. Wright*. 82 F.4th 362 (5th Cir. 2023). That case involved Professor Jackson, a music theory professor at the University of North Texas ("UNT"), who published an article in a symposium issue defending an Austrian music theorist against charges of racism. *Id.* at 365. Professor Jackson published the article in a Journal that he founded, but that UNT exclusively published and funded. *Id.* After assembling

a panel to investigate the article's publication, Professor Jackson's department chair informed him that he would be removed from the Journal and the University was pulling its funding from the Journal and the center for which Professor Jackson served as director. *Id.* at 366. Professor Jackson sued the UNT Board of Regents for first amendment retaliation. *Id.* The Board moved to dismiss Professor Jackson's claims on the basis of sovereign immunity. *Id.* The undersigned denied the motion. *Id.* On appeal, the Fifth Circuit evaluated whether Professor Jackson's official capacity claims against the Board satisfied *Ex parte Young*. *Id.* at 367. The court allowed Professor Jackson's official capacity claims to survive under *Ex parte Young*, concluding that the Board had "direct governing authority" over the UNT officials responsible for violating Professor Jackson's First Amendment rights. *Id.* at 368. The court added that the Board itself ignored a letter that Professor Jackson wrote to the Chair of the Board in which he sought relief for the ongoing violation of his First Amendment rights. *Id.* Thus, the court held that Professor Jackson pleaded a sufficient connection between the Board and the violation of his First Amendment rights such that sovereign immunity did not bar Professor Jackson's claims against the Board at the pleading stage. *Id.*

The upshot of the Court's analysis in *Texas Democratic Party v. Abbott* and *Jackson v. Wright* is that the "some connection" test is not as lax as it may seem. The test has real teeth, which the Court must enforce. The test is one of control. For a defendant to be proper under *Ex parte Young*, he cannot be so removed from the conduct of which the plaintiff complains so as to be an ethereal actor. Indeed, the question of control is one of degree. That is to say, control is a spectrum. On one end of the spectrum are those ethereal actors—like Attorney General Paxton—that are so meaningfully detached from the challenged harm that they are not proper defendants. On the other end are individuals intimately involved with perpetrating and charged with crafting the harm that

23

a plaintiff challenges—like Secretary Hughs—that they are proper defendants under *Ex parte Young*. The area between the bookends poses a fact-laden inquiry shaded in gray for the Court to decide on a case-by-case basis. This case presents five Defendants, each of whom occupy a different position on the "control spectrum."

With these principles in mind, the Court returns to Casper's claims and asks whether the Defendants had a sufficient connection to the alleged First Amendment retaliation against her. *See Ex parte Young*, 209 U.S. at 157. In her Amended Complaint, Casper asserts that all five Defendants played some part in Casper's retaliatory suspension (Dkt. #12 at pp. 2–3) (claiming that each Defendant "had authority over and was involved in the decision to suspend Casper"). Thus, Casper seeks redress against each. The question before the Court, then, is whether Defendants' respective duties have manifested themselves into an exercise of control over Casper's investigation and subsequent suspension. In other words: who pulled the strings behind Casper's suspension? The Court will address each defendant in turn.

*Genevieve West*

First, Casper's Complaint chronicles in detail West's involvement with—and authority over—Casper's suspension (*See* Dkt. #12 at pp. 6–11). Casper specifically names West and Yardley as directly responsible for her suspension, with Tilton and Feyten's approval (Dkt. #12 at ¶ 50). She further alleges that the other Defendants aided in bringing about her suspension (Dkt. #12 at ¶ 50). Because West and Tilton hold supervisory roles on the faculty, Casper alleges that they, independently and jointly, "have authority over Casper and punished her for her speech and communications related to 'wokeness'" (Dkt. #12 at ¶ 52). Finally, she mentions that West authored the November 4, 2022, letter to Casper that informed her of the University's

investigation into her statements (Dkt. #12 at ¶ 56). Casper asserts that these "specific and detailed allegations" constitute "more than a sufficient connection" between West and the alleged violation of Casper's First Amendment rights (Dkt. #19 at ¶ 19).

*Abigail Tilton*

Casper's Amended Complaint also alleges that Tilton, as the Dean of the College of Arts & Sciences, supervises West (Dkt. #12 at ¶ 6). Therefore, West reports to her (Dkt. #12 at ¶ 6). She also maintains that Tilton, alongside Feyten, was responsible for approving Casper's suspension (Dkt. #12 at ¶ 50). Again, Casper insists that these connections are sufficient to satisfy *Ex parte Young* (Dkt. #19 at ¶ 19).

*Carine Feyten*

Like her allegations against Tilton, Casper submits that Feyten approved Casper's suspension (Dkt. #12 at ¶ 50). She adds that in prior discussions between Casper and Feyten, "Feyten has confirmed that she is aware of the disciplinary actions [taken against Casper] and has the authority to overrule any such actions taken" (Dkt. #12 at ¶ 53). Casper goes on to allege that, "rather than correct the misdoings of her underlings, Feyten has confirmed that she does 'not want them to lose face'" (Dkt. #12 at ¶ 53). According to Casper, Feyten has "refused to correct the misdoings" of her subordinates before, even when the University did not follow its own disciplinary procedures (Dkt. #12 at ¶ 54). Casper maintains that "far more than a scintilla" connects Feyten and the other Defendants to their retaliatory conduct (Dkt. #19 at ¶ 19).

*Anthony Yardley*

Casper's contentions against Yardley are more sparse than her contentions against West, Tilton, and Feyten. Casper's Amended Complaint argues that Yardley is connected to Casper's

suspension in two ways (*See* Dkt. #12). First, she couples Yardley with West as the two individuals responsible for her suspension (Dkt. #12 at ¶ 50). Second, she mentions a second letter that she received on November 4, 2022—this time from Yardley—informing Casper of her alleged violation of the University's code of conduct, which laid out the procedures for the investigation and prohibited Casper from retaliating against any participant in the investigation (Dkt. #12 at ¶ 58; Dkt. #16-7). In her Response to Defendants' Motion to Dismiss, Casper notes that these allegations are sufficient to connect Yardley to Casper's suspension (*See* Dkt. #19 at ¶¶ 17–18).

*Katherine Antwi Green*

Finally, Green's involvement. Casper points to Green's role as the University's chief of compliance, which provides Green with the authority to "oversee[] investigations," like the one into Casper's conduct (Dkt. #12 at ¶ 93). Casper allegedly requested "documents, reports, and information supporting the stripping of Casper from her role as a tenured professor" (Dkt. #12 at ¶ 93). According to Casper, Green did not furnish the requested documents, but instead "flatly refused and pushed forward with trampling on Casper's constitutional rights" (Dkt. #12 at ¶ 60). Casper argues that Green's failure to provide Casper with these documents constituted a failure on the part of the University to provide Casper with reasonable notice regarding her suspension (Dkt. #12 at ¶ 60). Finally, Casper claims that, in essence, Green ignored and failed to act on Casper's complaints of retaliation (Dkt. #12 at ¶ 93). These connections, Casper argues, are sufficient to invoke the *Ex parte Young* exception and allow for Casper's official capacity claims against Green to proceed (*See* Dkt. #19 at ¶ 19).

Defendants might argue (though they did not) that, under *Abbott*, Green is more akin to Attorney General Paxton than she is to Secretary Hughs. *See Tex. Democratic Party*, 978 F. 3d at 168.

26

But a close reading of *Abbott* belies that argument. The Fifth Circuit's conclusion that Paxton lacked the requisite connection to the challenged law was predicated on the court's view that Paxton's enforcement authority was purely ethereal. *Id.* at 181. Specifically, the fact that he sent letters to judges and election officials warning them not to permit mail-in voting without cause did not render him a proper defendant under *Ex parte* Young. *Id.* The court reached that conclusion in part because the letters did not threaten that he would actually *enforce* the law, though he had the general power to do so. *Id.* The fact that he had such general (and unexercised) authority did not yield a conclusion that enforcement was imminent. *Id.*

Paxton's role in *Abbott* is a far cry from Green's role here. Green, unlike Paxton, was (and remains) on the ground floor of enforcing the adverse action of which Plaintiff complains (*See* Dkt. #12 at ¶ 93). Colloquially, "the buck stops" with Green. Like Paxton, Green has general oversight authority over the school's investigations and policies (Dkt. #12 at ¶ 93). And like Paxton, Green has the duty to exercise that authority (Dkt. #12 at ¶ 93). But Green's role is farther and more specific than Paxton's, too. Green's unique province is to oversee the investigation process, and according to Casper's Complaint, Green did in fact *exercise* that authority (*See* Dkt. #12 at ¶¶ 60, 93). Casper even asked Green to exercise her authority to remedy the situation, and Green refused to do so (Dkt. #12 at ¶ 93). That represents a greater level of control over the adverse action than Paxton exercised or possessed in *Abbott*. Thus, while Green may be a closer call on *Ex parte Young*'s essential "control spectrum," certainly, she appears to be proper defendant at this stage. The other Defendants, who had more involvement in (and control over) Casper's investigation and suspension, are not as questionable as Green on the "control spectrum." Therefore, they are the

27

"right" defendants under the *Ex parte Young* test as articulated in *Abbott. See Tex. Democratic Party*, 978 F. 3d at 168

In sum, the Court is satisfied that Casper has pleaded a sufficient connection between the Defendants and the alleged violation of her First Amendment rights. In their Motion to Dismiss, Defendants advance the counterargument that "Casper's Amended Complaint is devoid" of the factual content necessary to allow the Court to reasonably infer that the Defendants are liable for the misconduct alleged (Dkt. #16 at p. 9) (quoting *Iqbal*, 556 U.S. at 678). The Court disagrees. Moreover, "state sovereign immunity is an affirmative defense, and plaintiffs are not required to anticipate or plead around affirmative defenses." *Jackson*, 82 F.4th at 368 (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). Instead, "it was the [Defendants'] obligation to raise the defense." *Id.* Therefore, at the pleading stage, the Court cannot say that Casper impermissibly sued defendants protected by sovereign immunity. *See id.*

## 2.    *The Right Relief*

The Court next turns to Casper's requested relief. In her Amended Complaint, Casper requests a declaratory judgment that Defendants violated her constitutional rights by suspending her based on her protected speech without proper notice (Dkt. #12 at p. 17). She also seeks an injunction to prevent Defendants from taking any further adverse actions against Casper pursuant to the investigation into her alleged protected speech, and to restore Casper to full service on the faculty, including her positions on committees and her full course load (Dkt. #12).

In the Fifth Circuit, "whether a suit may proceed under *Ex parte Young* does 'not require an analysis of the merits of the claim.'" *Haverkamp*, 6 F.4th at 669 (quoting *K.P. v. LeBlanc*, 627 F.3d at 124) (cleaned up). It is enough if the requested relief is "'declaratory or injunctive in nature

and prospective in effect.'" *NiGen Biotech*, 804 F.3d at 394 (quoting *Saltz v. Tenn. Dep't of Emp't Sec.*, 976 F.2d 966, 968 (5th Cir. 1992)). Casper's Amended Complaint requests only declaratory and injunctive relief (Dkt. #12 at p. 17). Thus, central to the analysis is whether Casper's request for relief is *prospective* in effect. In making that determination, "there is a meaningful distinction between an ongoing *effect* of a constitutional violation and an ongoing unlawful *act* by a state official." *Bellard v. Univ. of Tex. MD Anderson Cancer Ctr.*, 716 F. Supp. 3d 503, 511 (S.D. Tex. 2024) (citing *Stollings v. Tex. Tech Univ.*, No. 5:20-CV-250-H, 2022 WL 824842, at *8 (N.D. Tex. Mar. 18, 2022) (emphasis in original)). Likewise, the Court must distinguish between "acts of defendants done exclusively in the past and those that are threatened to occur in the future." *Id.* (citing *Shah v. Univ. of Tex. Sw. Med. Sch.*, 129 F. Supp. 3d 480, 496 (N.D. Tex. 2015)). If "the requested declaration seeks to remedy an ongoing effect of a one-time event," the Eleventh Amendment will bar such "backwards-looking relief." *Id.* (cleaned up).

Here, the Court is not satisfied that Casper has alleged sufficient facts to suggest that the declaratory relief she seeks is anything more than "backwards-looking." *See id.* For starters, the bare language of her request for declaratory relief suggests that Defendants "*violated* the First and Fourteenth Amendments" (Dkt. #12 at p. 17) (emphasis added). Her requested relief appears to focus on the Defendants' *past* behavior rather than the legality of their *current* actions. That will not do. *See Jackson*, 82 F.4th at 368 (concluding that a plaintiff "properly request[ed] only prospective relief" because the requested relief was "focused on the legality of the [defendant]'s current actions, not its past behavior"). Thus, Casper's request for declaratory relief does not appear to allege any ongoing violation of federal law. "[A] complaint must allege that the defendant *is violating* federal law, not simply that the defendant has done so." *NiGen Biotech*, 804 F.3d at 394

(citing *Green v. Mansour*, 474 U.S. 64, 71–73 (1985)). Casper's request for "declaratory judgment that Defendants violated the First and Fourteenth Amendments" by suspending her "based on her protected speech and without providing her with proper notice" seeks to do the latter, not the former (Dkt. #12 at p. 17). Accordingly, her requested declaration is neither ongoing nor prospective as required under *Ex parte Young. See Haverkamp*, 6 F.4th at 669. Therefore, it must be dismissed without prejudice. *United States v. $4,480,466.16 in Funds Seized from Bank of Am. Acct. Ending in 2653*, 942 F.3d 655, 666 (5th Cir. 2019) ("Claims barred by sovereign immunity are dismissed without prejudice, not with prejudice.").

Casper's requested injunctive relief, however, is different. Casper's Amended Complaint requests a temporary restraining order, preliminary injunction, and permanent injunction ordering Defendants in their official capacities:

a.   To refrain from taking any disciplinary, punitive or other adverse actions against Casper pursuant to the investigation detailed in the November 4, 2022 letters, or pursuant to the earlier suspension from teaching based on false accusations of disability discrimination and demeaning conduct, or on the basis of Casper's protected speech [(the "Disciplinary Injunction")];

b.   To restore Casper to full service on faculty including services on student organization advising committees, committee service, and to restore Casper to a full course load to teach. Further, to restore Casper's ability to choose the courses she wants to teach and regularly taught and not, through explicit or covert means, attempt to prevent her from teaching those courses [(the "Committee Service Injunction")]; and

c.   To refrain from steering students away from Casper's courses [(the "Course Injunction")].

(Dkt. #12 at p. 17) (cleaned up). Defendants challenge Casper's requested Disciplinary Injunction and Committee Service Injunction in their Motion to Dismiss and Supplement, but do not appear to directly dispute the propriety of Casper's requested Course Injunction (*See* Dkt. #16; Dkt. #31). The Court addresses each challenge in turn.

*The Disciplinary Injunction*

First, Defendants challenge Casper's requested Disciplinary Injunction by attempting to classify it as an impermissible affirmative injunction (Dkt. #16 at pp. 10–11). Defendants take issue with Casper's requested relief because it "improperly requests that the Court order affirmative relief rather than requesting that Defendants cease unlawful conduct" (Dkt. #16 at p. 11). In support, Defendants cite to *Larson v. Domestic & Foreign Com. Corp.* for the proposition that "if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign," a suit against the sovereign will fail (Dkt. #16 at pp. 10–11) (quoting 337 U.S. 682, 691 n.11 (1949)). It would appear that Defendants flatly misunderstand what an affirmative injunction is. Black's Law Dictionary defines an affirmative injunction as "[a]n injunction that compels a party to do some act or mandates a specified course of conduct." *Affirmative Injunction*; *Mandatory Injunction*, BLACK'S LAW DICTIONARY (12th ed. 2024). Contrast that with a prohibitory injunction, which is one "that forbids or restrains an act; esp., an injunction proscribing the continuation of a course of conduct." *Prohibitory Injunction*, BLACK'S LAW DICTIONARY (12th ed. 2024).

Here, Casper's Disciplinary Injunction is not an affirmative injunction; it is prohibitory. Casper requests that Defendants "*refrain* from taking any disciplinary, punitive, or other adverse actions" against her (Dkt. #12 at p. 17) (emphasis added). Certainly, to *refrain* from doing something is more akin to *cessation* or *restraint* than it is to *compelling* someone to take some "affirmative action." *Compare Act*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A thing done or being done.") *with Cease*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("To stop, forfeit, suspend, or bring to an end.") *and Refrain*, WEBSTER'S THIRD INTERNATIONAL DICTIONARY (3d ed. 1961)

("To abstain from."). Casper's relief requests the former, not the latter. Casper's Disciplinary Injunction requests relief from what she perceives to be an ongoing threat of retribution for exercising her First Amendment rights (Dkt. #12 at p. 17). Taking her Complaint at face value, as the Court must at this stage, she has alleged an ongoing violation that can be cured by a prohibitory injunction (Dkt. #12 at p. 17). Indeed, to comply, Defendants need do nothing other than cease any conduct that perpetuates that threat. *See Larson*, 337 U.S. at 691 n.11.

Nonetheless, Defendants argue, in the alternative, that even if the Court may "affirmatively order" Defendants to perform some ministerial functions, "it cannot order state officials to exercise the State's sovereign power by performing their discretionary duties in a particular way" (Dkt. #16 at p. 11). Thus, Defendants submit that Casper's requested Disciplinary Injunction "forbidding Defendants from exercising their discretion to investigate and take corrective action," would violate the Eleventh Amendment (Dkt. #16 at p. 11). Not so. The Fifth Circuit affirmed nearly identical relief at the motion to dismiss stage in *Jackson v. Wright*. 82 F.4th at 368 (allowing a request to enjoin state officials from *taking any adverse action* against a plaintiff to survive the sovereign immunity defense at the pleading stage) (emphasis added) (citing *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) ("[W]hen a federal court commands a state official to do nothing more than refrain from violating the law, he is not the State for sovereign-immunity purposes.")). To conclude, Casper's requested Disciplinary Injunction has "allege[d] an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002). Thus, at the pleading stage, sovereign immunity will not bar her requested Disciplinary Injunction against Defendants.

*The Committee Service Injunction*

The Committee Service Injunction, on the other hand, poses different problems for Casper. Again, Defendants contend that restoring Casper to full committee service would qualify as an impermissible affirmative injunction (Dkt. #16 at p. 10). This time, however, Defendants are correct in their classification.

Unlike the Disciplinary Injunction, the Committee Service Injunction seeks to "compel [Defendants] to do some act"—namely, restore Casper to her committee service. *Affirmative Injunction*; *Mandatory Injunction*, BLACK'S LAW DICTIONARY (12th ed. 2024). But while it is true that "a court may not 'control [an officer] in the exercise of his discretion,'" whether *Ex parte Young* extends so far as to bar "*all* affirmative injunctions against an officer 'is an unsettled question that has roused significant debate.'" *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 241–42 (5th Cir. 2020) (emphasis added) (internal citations omitted). And just like the Fifth Circuit in *Richardson*, the Court will likewise decline to settle that debate today. *Id*. at 241. After all, conducting only a "straightforward inquiry" into Casper's Complaint reveals that Casper alleges her removal from committee service constitutes an "ongoing violation of federal law" for which her requested relief can be classified as "prospective." *See Verizon*, 535 U.S. at 646.

Instead, the Court will evaluate the propriety of the Committee Service Injunction by analyzing Defendants' more recent argument—that because Casper has already been restored to her committee service, "there is no 'ongoing violation of the federal constitution,' and the *Ex parte Young* exception is therefore inapplicable" (Dkt. #31 at p. 4) (citing *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013); *La. Env't Action Network v. U.S. E.P.A.*, 382 F.3d 575, 581 (5th Cir. 2004)). Defendants maintain that Casper's restoration to committee service has effectively rendered all of

her claims—particularly her requested Committee Service Injunction—moot (Dkt. #31 at pp. 3–4). So, the argument goes, any alleged violation of federal law cannot be said to be "ongoing" as *Ex parte Young* requires (Dkt. #31 at pp. 3–4).

*LeBlanc* actually stands for the exact opposite proposition. 729 F.3d at 439. There, the Fifth Circuit examined the intersection of the mootness doctrine with *Ex parte Young*'s "ongoing" requirement. *Id*. at 438–40. As relevant here, the court's analysis focused on two questions. First, whether a defendant's unilateral cessation of challenged conduct renders moot a plaintiff's claim challenging that conduct.[8] *See id*. at 438. Second, whether a defendant may assert that the conduct of which a plaintiff complains is not "ongoing" under *Ex parte Young* because it would have been moot absent the voluntary cessation doctrine (which *Ex parte Young* does not overtly incorporate).[9] *See id*. at 439. The Fifth Circuit answered both questions in the negative. *See id*. at 438–40. As to the former question, the court held that because it was not certain that the Board would not again refuse to convene a review panel, the case was not moot. *Id*. at 438; *see also Texas v. E.E.O.C.*, 933 F.3d at 449. In short, the court applied the voluntary cessation exception to mootness. 729 F.3d at

---

[8] *LeBlanc* involved a constitutional challenge to a Louisiana state law that excluded abortions from coverage under the Louisiana Patient's Compensation Fund ("the Fund"). *Id*. at 431. The Fund was part of Louisiana's Medical Malpractice Act of 1975 ("the Act"), which provided limited liability to participating healthcare providers. *Id*. The Fund provided a pool of money to compensate victims of medical malpractice. *Id*. Under the Act, providers were entitled to review from a medical expert panel tasked with determining whether the provider violated the applicable standard of care in the underlying medical malpractice claim. *Id*. To do so, the provider was required to go through the Patients' Compensation Fund Oversight Board ("the Board"), which would assess whether the provider was entitled to a medical panel review. *Id*. A group of medical providers performed an abortion that subjected them to a medical negligence claim. *Id*. at 432–33. Rather than insulate the providers from liability under the Fund, the Board concluded that the providers' performance of an abortion was not covered under the Act and, therefore, not subject to limited liability and capped damages. *Id*. at 433. The providers sued the Board, then the Board changed course by retroactively convening a medical review panel to assess the providers' compliance with the applicable standard of care. *Id*. The Board argued that the commencement of a review panel rendered moot all claims challenging the medical review process. *Id*. at 438.

[9] In defending the suit by the providers, the Board raised sovereign immunity as a defense. *Id*. at 439. The Board argued that the providers could not meet the *Ex parte Young* exception because, upon completion of the panel's medical review, "any violation of federal law is no longer ongoing." *Id*.

438. As to the latter question, the Board argued that after the completion of the panel's medical review, any alleged violation of federal law cannot be said to be "ongoing." *Id.* at 439. The court was not persuaded and instead determined that accepting the Board's argument would run afoul of its mootness analysis. *Id.*

The same is true here. Because it is not clear that Casper's removal from full service on the faculty could not be reasonably expected to recur, this case is not moot. *See id.* at 438; *supra* Section II.A. Neither does it cease to be ongoing under *Ex parte Young* simply because Defendants have returned her to her committee service. To hold otherwise would allow any state actor who voluntary ceases their challenged conduct to effectively have two bites at the apple to avoid liability—first, under a mootness argument and again under a sovereign immunity argument. If the Court were to accept Defendants' argument, it would be forced to adopt an even harsher standard for the "ongoing" requirement than the one applied to the mootness inquiry. *See supra* Section II.A. In effect, this would permit claims that are justiciable via voluntary cessation to nevertheless fail under the heightened "ongoing" requirement of the *Ex parte Young* exception. The Court declines Defendants' invitation to adopt such a strict interpretation today. If the Court were to adopt Defendants' argument today, then tomorrow, taking Defendants' argument to its logical conclusion, any Defendant sued in his official capacity would be able to circumvent the well-established voluntary cessation exception in pursuit of dismissal under *Ex parte Young*. That result finds no support under the law. Here, Defendants' voluntary cessation—in the form of restoring Casper to her committee service—will not allow them to evade their exposure to liability under the exception. Any other conclusion would, as it would have in *LeBlanc*, "work an end-run around the

voluntary-cessation exception to mootness where a state actor is involved." *Id.* at 439. That is impermissible.

*The Course Injunction*

Finally, Casper requests an injunction that Defendants "refrain from steering students away from Casper's courses" (Dkt. #12 at p. 17). Without mentioning the Course Injunction specifically, Defendants again generally contest the adequacy of Casper's requested injunctive relief on the basis that it impermissibly requests an affirmative injunction and that it seeks to direct state officials in their exercise of discretion (Dkt. #16 at pp. 10–12). Defendants are wrong on both fronts.

Once more, the Course Injunction is not an affirmative injunction. Like the Disciplinary Injunction, the Course Injunction seeks to "forbid[] or restrain[]" Defendants' acts—by preventing them from discouraging students from taking Casper's classes—rather than "compel[] [Defendants] to do some act." *Compare Affirmative Injunction*; *Mandatory Injunction*, BLACK'S LAW DICTIONARY (12th ed. 2024) *with Prohibitory Injunction*, BLACK'S LAW DICTIONARY (12th ed. 2024). Accordingly, Casper's requested Course Injunction is properly classified as a prohibitory injunction, which is a proper form of relief under *Ex parte Young. See Verizon*, 535 U.S. at 646.

Next, Defendants purport to challenge the Course Injunction on the basis that it improperly directs the conduct of state officials acting within their discretion (Dkt. #16 at pp. 10–12). But the allegations in Casper's Amended Complaint, on their face, assert a violation of her constitutional rights (*See* Dkt. #12). Indeed, encouraging students not to take Casper's classes in retaliation for exercising her First Amendment rights, if true, could give rise to a First Amendment retaliation claim. Thus, because "[i]t is permissible under *Ex parte Young* for a court to 'command a state official to do nothing more than refrain from violating federal law,'" Casper's requested Course

Injunction requests the appropriate ongoing and prospective relief that *Ex parte Young* requires. *Tex. Democratic Party*, 978 F.4th at 180 (quoting *Va. Off. for Prot. & Advoc.*, 563 U.S. at 255).

In conclusion, the Court finds that Casper has sued the "right" defendants—those that have "some connection with the enforcement" of Casper's retaliatory suspension. *Jackson*, 82 F.4th at 367 (quoting *Ex parte Young*, 209 U.S. at 157). Whether her requested relief is proper is not as clear cut. Casper's request for declaratory relief is neither ongoing nor prospective, but purely "backwards-looking." *See Haverkamp*, 6 F.4th at 669. As such, *Ex parte Young* will not permit the Court to make such a declaration, and it must be dismissed. On the other hand, the Court is satisfied with the injunctive relief Casper requests. Specifically, through the Disciplinary and Course Injunctions, Casper seeks to prospectively prevent Defendants from taking any further retaliatory action in response to her exercise of her First Amendment rights. A straightforward inquiry into both requested injunctions reveals that, at this early stage, Casper has successfully pleaded an "ongoing violation of federal law" for which her requested relief can be classified as "prospective." *See Verizon*, 535 U.S. at 646. While the Committee Service Injunction poses additional questions, the Court arrives at the same result. To conclude that Casper's restoration to committee service nullifies her Committee Service Injunction because it is no longer "ongoing" under *Ex parte Young* would contravene longstanding principles of justiciability and create far too high a hurdle for plaintiffs to clear in bringing official capacity claims against state actors. Thus, the Court will permit all of Casper's claims for injunctive relief to proceed beyond the motion to dismiss stage.

## III.    Rule 12(b)(6) Motion to Dismiss

Shifting course, the Court now turns to the merits of Defendants' 12(b)(6) Motion (Dkt. #16) and Casper's Motion for Leave to File Second Amended Complaint (Dkt. #33), as those two

Motions are inextricably intertwined at this juncture. Beginning with Casper's Motion for Leave to Amend (Dkt. #33), the Court finds that Casper's Motion should be granted.

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave [to amend a pleading] when justice so requires." As constructed, "the language of this rule 'evinces a bias in favor of granting leave to amend.'" *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (cleaned up) (quoting *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002)). Thus, a court must have a "substantial reason" to deny a request for leave to amend a complaint. *Id.* Courts consider five factors in determining whether to deny leave to amend: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies by previous amendments; (4) undue prejudice to the opposing party; and (5) futility of the amendment. *SGIC Strategic Glob. Cap., Inc. v. Burger King Europe GmbH*, 839 F.3d 422, 428 (5th Cir. 2016).

In her Motion for Leave to File Second Amended Complaint (Dkt. #33), Casper seeks leave of court to amend her Complaint to add factual allegations rebutting Defendants' mootness argument and to add nominal damages as a proper remedy to support her individual capacity claims (Dkt. #33 at ¶ 5). In doing so, Casper argues that the basis for her requested amendment "derives from Defendants' attempt to dismiss Casper's claims due to their own actions" (Dkt. #33 at ¶ 6) (cleaned up). Citing Rule 15(a), Casper claims that permitting her to amend her Complaint would not cause undue delay and that she does not request her amendment out of bad faith or dilatory motive (Dkt. #33 at ¶ 6). Defendants, of course, disagree (Dkt. #38). In their view, granting leave to amend would be improper because Casper's amendments would be futile and leave to amend would cause undue delay (Dkt. #38).

After considering the relevant factors through the lens of Rule 15(a)(2)'s strong policy in favor of granting leave to amend, the Court finds that Casper's Motion should be granted. Defendants' Response to Casper's request for leave does not address all five factors above (*See* Dkt. #38). Instead, it focuses on factors one and five (Dkt. #38). The Court begins with analyzing the factors Defendants dispute. Then, the Court analyzes the remaining factors that Defendants' Response leaves unaddressed.

The Court begins, as Defendant's Response does, with the fifth factor. Defendants argue that their alleged entitlement to qualified immunity renders Casper's proposed amendments futile (Dkt. #38 at p. 3). That is incorrect. To date, Defendants have yet to fully brief the Court on their alleged qualified immunity protection (*See* Dkt. #16).[10] Consequently, it would be improper for the Court to put the proverbial cart before the horse and deny Casper leave to amend on qualified immunity grounds before weighing the parties' arguments on that issue. Thus, the fifth factor weighs in favor of granting leave.

Turning to the first factor, the Court also disagrees with Defendants' second challenge to the timing of Casper's request (Dkt. #38 at p. 7). While the Court recognizes Casper's delay in bringing her motion for leave, it will not deny leave here based upon delay alone. As Defendants observe, Casper requests leave to amend more than thirteen months after she filed her initial Complaint (Dkt. #1), nearly one year after she filed her First Amended Complaint (Dkt. #12), and nearly ten months after Defendants filed their Motion to Dismiss (Dkt. #16) (Dkt. #38 at p. 7). But

---

[10] In a footnote in Defendants' Motion to Dismiss, Defendants note that "[i]t does not appear at this time that monetary damages are being sought, so the qualified immunity defense has not been fully briefed, but it is hereby preserved" (Dkt. #16 at p. 17 n.2). Given that this Order grants Casper leave to amend her Complaint to add a claim for nominal damages, the Court will permit Defendants to re-assert the bases for their 12(b)(6) motion, including any qualified immunity defense.

"delay alone is an insufficient basis for denial of leave to amend." *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004). Indeed, "[t]he delay must be *undue*, i.e., it must prejudice the nonmoving party or impose unwarranted burdens on the court." *Id*. Here, the Court concludes that any delay that Casper caused in requesting leave to amend on this late date is not sufficiently undue to warrant denial of leave because it does not prejudice Defendants. *Smith v. EMC Corp.*, 393 F.3d at 596 (quoting *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) ("A defendant is prejudiced if an added claim would require the defendant 'to reopen discovery and prepare a defense for a claim different from the one . . . that was before the court.'") (cleaned up)). On March 28, 2024, the Court issued an Order staying discovery pending its resolution of Defendants' Motion to Dismiss (Dkt. #36). Thus, allowing Casper to amend her Complaint will not force Defendants' to "reopen discovery" to defend a claim different from the ones that Casper already asserted in her Amended Complaint (Dkt. #12). *See id*. Hence, the first factor above similarly weighs in favor of granting leave.

While Defendants did not fully brief the Court on the remaining three factors, the Court finds that, as to those factors, the weight of evidence in the record before it leans in favor of granting leave. Indeed, Defendants have not shown that Casper's request for leave would unduly prejudice Defendants, that Casper has exhibited a repeated failure to cure any deficiencies in her Complaint, or that she requests leave out of bad faith or dilatory motive (*See* Dkt. #38). In sum, the Court finds that Rule 12(a)(2) counsels in favor of granting Casper leave to amend her Complaint for a second time given that the relevant factors supporting a denial of leave are not present here.

Having determined that Casper is entitled to leave of court to amend her Complaint, the operative Complaint before the Court is Casper's Second Amended Complaint (Dkt. #34).

Therefore, any arguments in the Rule 12(b)(6) portion of Defendants' Motion to Dismiss (Dkt. #16) are challenging a complaint that is no longer live. Consequently, Defendants' Motion to Dismiss under Rule 12(b)(6) (Dkt. #16) is denied as moot. However, the Court notes that this Order does not preclude Defendants from re-raising the arguments they made in their 12(b)(6) Motion to Dismiss (Dkt. #16) later in the litigation stream, even through a subsequent 12(b)(6) motion.[11]

## CONCLUSION

It is therefore **ORDERED** that Defendant's Motion to Dismiss (Dkt. #16) is hereby **GRANTED in part** and **DENIED in part.** Plaintiff's Opposed Motion for Leave to File Second Amended Complaint (Dkt. #33) is hereby **GRANTED.**

Specifically, the Court **ORDERS** as follows:

1.     Casper's request for a declaratory judgment that Defendants violated the First and Fourteenth Amendments of the United States Constitution (Dkt. #12 at ¶ 1) is **DISMISSED without prejudice**.

As it relates to the remainder of Casper's claims for injunctive and monetary relief:

2.     Defendants' Motion to Dismiss on the basis of sovereign immunity is **DENIED**;

3.     Defendants' Motion to Dismiss on the basis of mootness is **DENIED**;

---

[11] Defendants' ability to re-raise their arguments applies to Defendants' 12(b)(6) challenges to Casper's First Amendment retaliation claim and her First Amendment Viewpoint Discrimination claim (Dkt. 16 at pp. 12–24). Defendants also assert *res judicata* as a basis for dismissal under Rule 12(b)(6) (Dkt. #16 at p. 21). But the preclusive doctrine that Defendants actually intend to assert is collateral estoppel. *Carr v. United States*, 507 F.2d 191, 193 n.5 (5th Cir. 1975) ("While res judicata bars relitigation of the same cause of action, collateral estoppel bars relitigation of the same facts or issues that were necessarily determined in the prior proceeding."). In any event, however, while some courts have considered collateral estoppel on a motion to dismiss under Rule 12(b)(6), "the Fifth Circuit has held that generally a res judicata [(or collateral estoppel)] contention cannot be brought in a motion to dismiss." *Segatto v. JPMorgan Chase Bank, N.A.*, No. 4:16-CV-00712-ALM, 2016 WL 7664306, at *3 (E.D. Tex. Dec. 16, 2016), *report and recommendation adopted*, No. 4:16-CV-712, 2017 WL 67944 (E.D. Tex. Jan. 6, 2017). Thus, the Court will not consider Defendants' arguments that Casper's claims are barred by collateral estoppel at the 12(b)(6) stage, but instead will direct Defendants to raise collateral estoppel as an affirmative defense in their answer. *See Am. Realty Tr., Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. App'x 662, 664 n.1 (5th Cir. 2004) ("*Res judicata* is an affirmative defense that should not be raised as part of a 12(b)(6) motion but should instead be addressed at summary judgment or at trial.").

4.    Casper's Motion for Leave to File Second Amended Complaint (Dkt. #33) is **GRANTED** and her Second Amended Complaint (Dkt. #34) is deemed **FILED**; and

5.    Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) is **DENIED as moot.**

**IT IS SO ORDERED.**

**SIGNED this 18th day of February, 2025.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE