# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| VIVIAN CASPER, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| GENEVIEVE WEST, in her official | § | |
| capacity as Chair of Department of | § | |
| Language, Culture, & Gender Studies; | § | |
| ABIGAIL TILTON, in her official | § | |
| capacity as Dean Of The College Of | § | |
| Arts & Sciences; CARINE FEYTEN, in | § | Civil Action No. 4:23-cv-42 |
| her official capacity as Chancellor and | § | Judge Mazzant |
| President; ANTHONY YARDLEY, in | § | |
| his official capacity as Director of | § | |
| Employee Relationships, HR | § | |
| Compliance & Equity; KATHERINE | § | |
| ANTWI GREEN, in her official capacity | § | |
| as General Counsel, Secretary of the | § | |
| Board of Regents, and Chief | § | |
| Compliance Officer; and ASHLEY | § | |
| BENDER, in her official capacity as | § | |
| Interim Chair of Department of | § | |
| Language, Culture, & Gender Studies | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion to Dismiss Plaintiff's Third Amended

Complaint (Dkt. #59). Having considered the Motion and the relevant pleadings, the Court finds

that the Motion should be **GRANTED in part** and **DENIED in part**.

## BACKGROUND

This is a First Amendment retaliation case arising out of Plaintiff Vivian Casper's

("Plaintiff") suspension from her professorial duties at Texas Women's University ("TWU"), a

public university (Dkt. #51 at ¶ 57). Many of the facts underlying this dispute have been fully set out in the Court's February 18 and April 17 Memorandum Opinions and Orders (Dkt. #42; Dkt. #53). However, because the complaint has been amended twice (Dkt. #34; Dkt. #51) since the Court considered and reconsidered (Dkt. #42; Dkt. #53) Defendants' first Motion to Dismiss (Dkt. #16), the Court will recount the background relevant to the instant motion.

## I.    Factual Background

On April 9, 2025, Plaintiff filed her Third Amended Complaint (the "Complaint") asserting two claims against Defendants[1] under 42 U.S.C. § 1983—viewpoint discrimination and retaliation in violation of the First Amendment (Dkt. #51 at ¶¶ 80–113). The factual allegations in Plaintiff's Complaint proceed as follows.

For over fifty years, Plaintiff served as an English professor at TWU before retiring on January 31, 2025 (Dkt. #51 at ¶¶ 19, 69). During this time, Plaintiff taught more than thirty different undergraduate and graduate courses, published numerous pieces, and spoke about her scholarship throughout the United States (Dkt. #51 at ¶ 19). Plaintiff alleges her performance as a professor has been exceptional, and she contends she is revered by the faculty (Dkt. #51 at ¶¶ 20, 24).

To better understand the events that gave rise to this suit, the Court must first acknowledge Plaintiff's position on "woke" ideology. "Wokeness"—as Plaintiff explains it—is "being alert to and concerned about social injustice and discrimination" (Dkt. #51 at ¶ 35). Plaintiff alleges that

---

[1] As defined in Plaintiff's Complaint (Dkt. #51), Defendants are (1) Genevieve West, former Chair of the Department of Language, Culture, & Gender Studies; (2) Abigail Tilton, the Dean of the College of Arts & Sciences; (3) Carine Feyten, Chancellor and President of the University; (4) Anthony Yardley, Director of Employee Relations, HR Compliance & Equity; (5) Katherine Antwi Green, General Counsel, Secretary to the Board of Regents, and Chief Compliance Officer for the University; and (6) Ashley Bender, current Chair of Department of Language, Culture, & Gender Studies. The Court will refer to them collectively as "Defendants."

her academic department, the Department of Language, Culture & Gender Studies, came out strongly in favor of this ideology, with which Plaintiff disagrees (Dkt. #51 at ¶ 34). Plaintiff contends that this shift was instigated and strongly led by Genevieve West[2] ("West"), former Chair of the Department of Language, Culture, & Gender Studies, and Plaintiff also claims Defendants disfavor and oppose the "non-woke" viewpoints she holds (Dkt. #51 at ¶¶ 34, 37).

With that in mind, Plaintiff alleges Defendants' first "blatant attack" on Plaintiff's right to freedom of speech occurred when Defendants "falsely accused" Plaintiff of discriminating against a student that had failed one of Plaintiff's courses on the basis of race and disability (Dkt. #51 at ¶¶ 40–41). Plaintiff was subsequently removed from most of her professorial roles at TWU (Dkt. #51 at ¶ 41). Sometime in October of 2022, Plaintiff learned that she would not be given any courses to teach in the following spring semester (Dkt. #51 at ¶ 42).

Plaintiff alleges Defendants' purported First Amendment violations continued. On October 12, 2022, Plaintiff attended a faculty meeting where she responded to a fellow faculty member's statement that exhibited the "woke" ideology Plaintiff opposes, as discussed above (Dkt. #51 at ¶ 45). Specifically, Ashley Bender[3] ("Bender"), a fellow faculty member and now the Chair of Language, Culture & Gender Studies at TWU, was speaking when Plaintiff delivered a truncated response—"[y]ou should read more"—to address Bender's statements (Dkt. #51 at ¶ 45). Plaintiff alleges West demanded that Plaintiff clarify her response to Bender, but Plaintiff

---

[2]  Plaintiff alleges that at the time of this incident, West had authority over Plaintiff and was involved in the decision to suspend her (Dkt. #51 at ¶ 6).

[3]  Plaintiff alleges Bender has authority over Casper's appointment to *Emeritus* status, and she was involved in and had authority over events that led to Plaintiff's constructive, forced retirement (Dkt. #51 at ¶ 11).

declined to engage in a verbal altercation with West (Dkt. #51 at ¶ 46). Instead, following this meeting, Plaintiff emailed West and Bender to elaborate on her position (Dkt. #51 at ¶ 47).

Plaintiff then contacted West to advise her that her fellow faculty members had spoken rudely to her, seemingly expecting West to come to her aid as her superior (Dkt. #51 at ¶ 49). Plaintiff complains that instead of addressing her concerns, West and Anthony Yardley[4] ("Yardley"), with the approval of Abigail Tilton[5] ("Tilton") and Carine Feyten[6] ("Feyten"), suspended Plaintiff because of her disfavored viewpoint—in violation of TWU's own disciplinary process (Dkt. #51 at ¶¶ 49–50, 54). Specifically, on November 4, 2022, Plaintiff received two letters from West and Yardley (Dkt. #51 at ¶ 56). These letters conveyed roughly the same information: TWU was investigating an allegation of unprofessional conduct in violation of TWU's policies (Dkt. #51 at ¶¶ 56, 58). Plaintiff contends that these letters fail to cite the relevant section(s) of TWU's code of conduct, provide the date of the alleged incident, note the names of the involved individuals, include the factual allegations supporting the alleged policy violations, or provide any other information that could help Plaintiff understand her wrongful conduct (Dkt. #51 at ¶ 59). Plaintiff claims that despite her requests for this information, Katherine Antwi Green[7] ("Green") refused (Dkt. #51 at ¶ 60). Plaintiff alleges Defendants have also either denied or ignored her previous requests that she be assigned to another supervisor (Dkt. #51 at ¶ 65).

---

[4]   Yardley is the Director of Employee Relations, HR Compliance & Equity at TWU (Dkt. #51 at ¶ 9). Plaintiff alleges Yardley had a role in the decision to suspend her (Dkt. #51 at ¶ 9).

[5]   Tilton is the Dean of the College of Arts & Sciences at TWU (Dkt. #51 at ¶ 7). West reports to Tilton, and Plaintiff alleges both West and Tilton had a role in the decision to suspend her (Dkt. #51 at ¶ 7).

[6]   Feyten is Chancellor and President of TWU (Dkt. #51 at ¶ 8). Plaintiff alleges Feyten had a role in the decision to suspend her (Dkt. #51 at ¶ 8).

[7]   Green is TWU's General Counsel, Secretary to the Board of Regents, and Chief Compliance Officer (Dkt. #51 at ¶ 10). Plaintiff alleges Green had a role in the decision to suspend her (Dkt. #51 at ¶ 10).

On January 13, 2023, Plaintiff initiated this lawsuit (Dkt. #1). At that time, Plaintiff's suspension was ongoing (Dkt. #51 at ¶ 67). However, on December 11, 2023, TWU's investigation concluded, and her suspension was lifted (Dkt. #51 at ¶ 67). This development, however, is insufficient to address Plaintiff's complaints against Defendants. Specifically, Plaintiff alleges that since bringing her claims, Defendants have forced her into a constructive retirement and ensured she will never receive *Emeritus* status as a professor (Dkt. #51 at ¶¶ 69–71).[8] Plaintiff contends that, with Bender as her supervisor, she felt like she had "no choice but to retire after being deprived of any meaningful role in her position as a tenured professor" (Dkt. #51 at ¶ 69).

On January 7, 2025, Plaintiff sent a written notice of retirement to Dr. Angela Bauer, Executive Vice President for Academic Affairs and Provost at TWU (Dkt. #51 at ¶ 69). Her notice indicated that her retirement would be effective on January 31, 2025 (Dkt. #51 at ¶ 69). Plaintiff further alleges that despite her retirement, Plaintiff remains "beholden to Defendants' authority to grant her *Emeritus* status, a designation honoring longstanding and exemplary achievement as a faculty member which conveys certain benefits" (Dkt. #51 at ¶ 70). Specifically, even though Plaintiff's designation as an *Emeritus* Professor would have been "unquestionable," as she alleges, in her position, Bender can "block and has blocked" Plaintiff from *Emeritus* consideration because of her ideological disagreement with Plaintiff over "wokeism" (Dkt. #51 at ¶ 70).[9]

---

[8] Plaintiff notes that "[u]nder TWU Regulation and Procedure Number URP: 02.315, to be eligible for *Emeritus* status, faculty must have served the University for ten (10) consecutive years; have a record of distinguished achievement as a teacher, scholar, and/or academic innovator within or external to the University; be nominated by one (1) faculty member within three (3) years of retirement; and be endorsed by a simple majority of the current faculty" (Dkt. #51 at ¶ 71).

[9] Plaintiff notes, that once a year, department chairs call for nominations of individuals that meet the *Emeritus* status criteria (Dkt. #51 at ¶ 71). Plaintiff alleges that in March 2025, Bender blocked Plaintiff's nomination (Dkt. #51 at ¶ 71).

## II.    Procedural Background

On February 18, 2025, the Court considered Defendants' first Motion to Dismiss and Plaintiff's Opposed Motion for Leave to File Second Amended Complaint (Dkt. #42). In the Court's February 18 Memorandum Opinion and Order, the Court noted that, because it was granting Plaintiff leave to file her Second Amended Complaint to request nominal damages, Defendants were permitted to fully brief a qualified immunity defense through a 12(b)(6) motion (Dkt. #42 at p. 39). However, Defendants were advised the Court would not consider an argument that Plaintiff's claims are barred by collateral estoppel at the 12(b)(6) stage (Dkt. #42 at p. 41).

On April 17, 2025, the Court considered Defendants' Motion for Reconsideration and Plaintiff's Opposed Motion for Leave to File Third Amended Complaint (Dkt. #53). In the Court's April 17 Memorandum Opinion and Order, the Court permitted Plaintiff to file her Complaint, but it also noted that it would permit Defendants to file a new 12(b)(1) motion to fully brief their sovereign immunity defense with respect to Plaintiff's official capacity claims raised in the Complaint (Dkt. #53 at p. 12).

On May 15, 2025, in line with the Court's orders, Defendants filed their Motion under Rules 12(b)(1) and 12(b)(6), urging the Court to dismiss Plaintiff's Complaint (Dkt. #59). Plaintiff responded (Dkt. #60). Defendants replied (Dkt. #61). The Motion is now ripe for adjudication.

## LEGAL STANDARD

## I.    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction when the district court does not have statutory and constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court

will consider the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In deciding the motion, the Court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (internal quotation marks omitted) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). The Court will accept as true all well-pleaded allegations set forth in the complaint and construe those allegations in the light most favorable to the plaintiff. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). Once a defendant files a motion to dismiss under Rule 12(b)(1) and challenges jurisdiction, the party invoking jurisdiction has the burden to establish subject matter jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). The Court will grant a motion to dismiss for lack of subject matter jurisdiction only if it appears certain that the claimant cannot prove a plausible set of facts to support a claim that would entitle it to relief. *Lane*, 529 F.3d at 557.

## II.    Rule 12(b)(6)

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City*

*of Aberdeen,* 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id*. "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *In re S. Scrap Material Co*., LLC, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 570).

## ANALYSIS

The Court begins its analysis by explaining what, exactly, Plaintiff requests in her Complaint. First, Plaintiff seeks a declaratory judgment that "Defendants' ongoing enforcement of policies or practices that restrict speech and deny adequate notice violates the First and Fourteenth Amendments of the United States Constitution, and that such actions continue to chill [Plaintiff's] constitutionally protected speech" (Dkt. #51 at pp. 18–19). Second, Plaintiff seeks injunctive relief; namely, Plaintiff asks the Court to order Defendants, sued in their official capacity, "[t]o refrain from taking any adverse actions against Casper pursuant to the investigation detailed in the November 4, 2022 letters, or pursuant to the earlier suspension from teaching based on false accusations of disability discrimination and demeaning conduct, or on the basis of Casper's protected speech" (Dkt. #51 at p. 18). Finally, Plaintiff requests nominal damages from Defendants in their individual capacities, as well as attorney fees and costs (Dkt. #51 at p. 18).

With that in mind, Defendants urge the Court to dismiss Plaintiff's claims—First Amendment retaliation and viewpoint discrimination (Dkt. #59). Defendants rely on four theories to do so. First, Defendants contend Plaintiff's official-capacity claims are jurisdictionally barred by sovereign immunity and ask the Court to find that the *Ex Parte Young* exception does not apply (Dkt. #59 at pp. 5–10). Second, Defendants allege Plaintiff has not stated a First Amendment claim for which relief can be granted (Dkt. #59 at pp. 10–18). Third, Defendants argue they are entitled to qualified immunity from Plaintiff's individual capacity claims (Dkt. #59 at pp. 18–24). Fourth and finally, Defendants re-assert that collateral estoppel bars Plaintiff's requested relief (Dkt. #59 at pp. 24–26). The Court will first address the jurisdictional challenge and then address the substantive challenges.

## I.    Rule 12(b)(1)

### A.    Sovereign Immunity

The Court begins with Defendants' Rule 12(b)(1) jurisdictional challenge based on sovereign immunity. The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The outgrowth of the Eleventh Amendment is sovereign immunity, which bars private suits against nonconsenting states in federal courts. *Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021) (citing *P.R. Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993)). But sovereign immunity protects more than states alone. For example, under the Eleventh Amendment, suits against state agencies, state departments, and state officials in their official capacities are also barred. *Corn v. Miss. Dep't of Pub. Safety*, 954 F.3d 268, 273–74 (5th Cir. 2020) (internal citation omitted).

Despite the Eleventh Amendment's broad applicability, it is not without its limits. Those limits are defined in three exceptions to the general rule of sovereign immunity. *Id.* First, sovereign immunity does not bar a suit if "the state has waived its sovereign immunity." *Id.* at 274. Second, sovereign immunity will not bar a suit if "Congress has clearly abrogated it." *Id.* Third and finally, the United States Supreme Court has carved out a narrow exception to sovereign immunity known as the *Ex parte Young* exception, which applies to "claims for prospective relief against state officials who have been sued in their official capacities." *Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 320 (5th Cir. 2008); *Ex parte Young*, 209 U.S. 123 (1908).

The *Ex parte Young* exception allows an individual to overcome a state actor's Eleventh Amendment immunity from suit if that suit seeks injunctive relief for alleged violations of the

United States Constitution. *See Ex parte Young*, 209 U.S. at 160. In the Fifth Circuit, if the *Ex parte Young* exception applies, "[s]uits by private citizens against state officers in their official capacities are not . . . categorically barred." *Fontenot v. McCraw*, 777 F.3d 741, 752 (5th Cir. 2015). Thus, "*Ex parte Young* created a narrow doorway through the sovereign immunity defense. To turn the key on the *Ex parte Young* door, a plaintiff must sue the right defendants and ask for the right remedy." *Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023).

Here, exceptions one and two do not apply. But, the parties dispute whether the *Ex parte Young* exception saves Plaintiff's Complaint (Dkt. #59 at p. 15; Dkt. #60 at p. 10). Defendants contend that Plaintiff's official capacity claims against them as public university officials are barred (Dkt. #59 at pp. 14–19). Specifically, Defendants argue (1) Plaintiff has not sufficiently alleged any Defendant's connection to the alleged First Amendment violations; and (2) all of Plaintiff's claims seek relief not available under *Ex parte Young* because she seeks retrospective relief or relief that would require an individual Defendant to affirmatively exercise their discretion in a certain way (Dkt. #59 at p. 15). Plaintiff disagrees (Dkt. #60 at pp. 4–8).

The gravamen of Plaintiff's Complaint is that "Defendants violated [Plaintiff's] First Amendment rights first by suspending her to such an extent she had no remaining job duties, leaving her with no option but to retire, and then by interfering with her ability to be fairly considered for emeritus status" (Dkt. #60 at p. 12). Indeed, in its April 17 Memorandum Opinion and Order, the Court found as follows:

> [T]he only remaining requests for relief in her [Third] Amended Complaint are her request for nominal damages against Defendants in their individual capacities, a declaratory judgment that Defendants' ongoing behavior toward [Plaintiff] violates the First and Fourteenth Amendments to the United States Constitution, and injunctive relief ordering Defendants to refrain from taking any adverse actions against [Plaintiff] pursuant to the investigation detailed in the November 4, 2022

11

letters. . . . . [T]he *ongoing* "adverse action" for which [Plaintiff] seeks injunctive
relief is Defendants' interference with [Plaintiff's] ability to be fairly considered for
emeritus status—a process over which she claims Bender has direct authority
(Dkt. #51 at pp. 12–13). In short, she seeks to remove the impediment to her full and
fair consideration for emeritus status post-retirement (*See* Dkt. #51 at pp. 12–13, 19).
Namely, [Plaintiff] seeks to be considered for emeritus status like any other similarly
situated professor, i.e., without regard to her view on "wokeism," which caused the
root controversy in this case (*See* Dkt. #51 at pp. 12–13, 19).

(Dkt. #53 at pp. 3, 10) (emphasis added).

Thus, for purposes of the Court's sovereign immunity analysis, it will focus on analyzing

the requested remedies as they relate to the alleged *ongoing* adverse employment action—namely,

Plaintiff's inability to be fairly considered for *Emeritus* status. With this in mind, the Court must

make two determinations: (1) whether Plaintiff has sued the right defendants; and (2) whether

Plaintiff has requested the right remedy.

### 1.    Right Defendants

The *Ex parte Young* exception allows a plaintiff to sue only state actors that have "some

connection with the enforcement" of the challenged law or policy. *Jackson*, 82 F.4th at 367 (quoting

*Ex parte Young*, 209 U.S. at 157). But while "[t]his circuit has not spoken with conviction" on the

connection requirement, "some guideposts have emerged." *Tex. Democratic Party v. Abbott*, 978

F.3d 168, 179 (5th Cir. 2020); *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022).

First, the official "must have more than a 'general duty to see that the laws are implemented.'" *Tex.

All. For Retired Ams.*, 28 F.4th at 672 (quoting *City of Austin v. Paxton*, 943 F.3d 993, 999–1000 (5th

Cir. 2019)). Second, that duty must also be "the particular duty to enforce the statute in question

and a demonstrated willingness to exercise that duty." *City of Austin*, 943 F.3d at 1000 (internal

citations omitted). Third and finally, this circuit defines "enforcement" as "compulsion or

constraint." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). A "scintilla of 'enforcement' by the

relevant state official with respect to the challenged law" is enough. *Tex. Democratic Party*, 978 F.3d at 179 (quoting *City of Austin*, 943 F.3d at 1002).

Here, again, the retaliatory and unconstitutional action Plaintiff complains of is the environment Defendants have fostered where she is unable to be fairly considered for *Emeritus* status (*See* Dkt. #51 at pp. 12–13, 19). Defendants first argue "[Plaintiff] does not even attempt to implicate West, Tilton, Feyten, Yardley or Green in her current lack of emeritus status . . . [f]or these Defendants, [Plaintiff's] Third Amend[ed] Complaint contains carryover allegations relevant only when the challenged action was [Plaintiff's] removal from faculty committees and lecture duties" (Dkt. #59 at p. 16). Defendants next argue that Plaintiff has failed to "demonstrate that Bender had a 'particular duty' related to the specific actions [Plaintiff] now challenges as violating the law" (Dkt. #59 at p. 17).[10]

In contrast, Plaintiff argues she "has alleged more than a scintilla of connection between each Defendant and the constitutional injuries she suffered" (Dkt. #60 at p. 11). Plaintiff reminds the Court that "her comments against 'wokeism,' which led to her suspension, arose from a disagreement" with Bender (Dkt. #60 at p. 12). Further, Plaintiff contends that Defendants West, Tilton, Feyten, Yardley, and Green exercised their respective authority to protect Bender at Plaintiff's expense (Dkt. #60 at p. 12). Specifically, Plaintiff avers that once Bender became interim-Chair of Plaintiff's academic department, replacing West, Plaintiff's viewpoint became even more "precarious," and each of Defendants' actions led to her "constructive, forced retirement" (Dkt. #60 at p. 12). Plaintiff continues that while Bender has the "distinct authority to

---

[10] At this stage, Plaintiff does not have a duty to "demonstrate," she must allege a plausible claim for relief. Again, the Court must accept as true all well-pleaded facts in the Plaintiff's Complaint and view those facts in the light most favorable to Plaintiff. *Bowlby,* 681 F.3d at 219.

interfere with [Plaintiff's] consideration for emeritus status, the actions of each Defendant forced [Plaintiff] into suspension and then constructive retirement" (Dkt. #60 at p. 12).

In Plaintiff's Complaint, Plaintiff explains that department chairs, like Bender, call for nominations of specific recently retired employees who otherwise meet the *Emeritus* criteria, like Plaintiff (Dkt. #51 at ¶ 71). Plaintiff contends Bender can "block and has blocked" Plaintiff from *Emeritus* consideration because of her viewpoint disagreement over "wokeism" (Dkt. #51 at ¶ 70). Specifically, Bender allegedly blocked Plaintiff's nomination in March 2025 (Dkt. #51 at ¶ 71). For now, this is enough for Plaintiff to allege "some connection" between Bender and the violation of her First Amendment rights. *Jackson*, 82 F.4th at 367. As such, Bender is the right Defendant.

As for Defendants West[11], Yardley[12], Tilton[13], Feyten[14], and Green[15], the Court finds the allegations Plaintiff makes against them are insufficient to meet the *Ex parte Young* exception. Again, the alleged ongoing adverse employment action at issue is Plaintiff's inability to be fairly considered for *Emeritus* status. Thus, Plaintiff's suspension and retirement are not the retaliatory or discriminatory conduct at issue. Despite this, Plaintiff alleges that each Defendant played a role in her suspension and her "constructive retirement" (Dkt. #60 at p. 11). Plaintiff goes so far as to assert that "[u]nless the suspension is enjoined and [Plaintiff] is returned to her position as a fully tenured professor with teaching and committee roles, she will continue to suffer irreparable injury"

---

[11]  West is the former Chair of Language, Culture & Gender Studies at TWU before being elevated (Dkt. #51 at ¶ 6).

[12]  Yardley is the Director of Employee Relations, HR Compliance & Equity at TWU (Dkt. #51 at ¶ 9).

[13]  Tilton is the Dean of the College of Arts & Sciences at TWU (Dkt. #51 at ¶ 7). West reports to Tilton (Dkt. #51 at ¶ 7).

[14]  Feyten is Chancellor and President of TWU (Dkt. #51 at ¶ 8).

[15]  Green is TWU's General Counsel, Secretary to the Board of Regents, and Chief Compliance Officer (Dkt. #51 at ¶ 10).

(Dkt. #51 at ¶ 78). As Defendant suggests, it is impossible for Plaintiff to have it both ways. First, Plaintiff's suspension has already been lifted. Second, if Plaintiff wants to be fairly considered for post-retirement *Emeritus* status, Plaintiff needs to be a *retired* professor.

As such, any role that West, Yardley, Tilton, Feyten, and Green played in her suspension and constructive retirement is insufficient to establish some connection to Bender's purported conduct in blocking Plaintiff's nomination *Emeritus* status consideration. Plaintiff has not alleged that any of the other Defendants have a scintilla of connection to the *Emeritus* consideration process at TWU. In fact, West, Yardley, Tilton, Feyten, and Green merely hold a supervisory role at TWU, which shows no more than a general duty to see that the laws of the university are implemented. This is insufficient to find that the *Ex Parte Young* exception applies. Indeed, in her response, Plaintiff admits that, other than Bender, Defendants do "not have a direct role in the emeritus nomination and voting process" (Dkt. #60 at p. 31).

Accordingly, only the official-capacity claims against Bender survive under this first issue.

### 2.    Right Remedy

The Court continues by addressing whether Plaintiff has sought the "right" remedy to invoke the *Ex parte Young* exception. In the Fifth Circuit, "whether a suit may proceed under *Ex parte Young* does 'not require an analysis of the merits of the claim.'" *Haverkamp*, 6 F.4th at 669 (quoting *K.P.*, 627 F.3d at 124) (citation modified). It is enough if the requested relief is "declaratory or injunctive in nature and prospective in effect." *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015) (citation modified).

Here, Plaintiff seeks declaratory judgment and injunctive relief (Dkt. #51 at pp. 18–19). Specifically, Plaintiff requests: (1) a declaratory judgment that "Defendants' ongoing enforcement of policies or practices that restrict speech and deny adequate notice violates the First and

Fourteenth Amendments of the United States Constitution, and that such actions continue to chill [Plaintiff's] constitutionally protected speech" (Dkt. #51 at pp. 18–19); and (2) injunctive relief by way of order that Defendants, in their official capacity, must "refrain from taking any adverse actions against [Plaintiff] pursuant to the investigation detailed in the November 4, 2022 letters, or pursuant to the earlier suspension from teaching based on false accusations of disability discrimination and demeaning conduct, or on the basis of [Plaintiff's] protected speech" (Dkt. #51 at p. 18).

Defendants argue Plaintiff's "requested relief improperly seeks to (1) declare that certain past activities were unlawful, (2) impose an affirmative obligation on the Defendants, or (3) control their discretion" (Dkt. #59 at p. 18). The Court disagrees. Plaintiff's only available remedies must relate to the alleged *ongoing* adverse employment action—namely, Plaintiff's inability to be fairly considered for *Emeritus* status prospectively. Plaintiff avers Bender can "block and has blocked" Plaintiff from *Emeritus* status consideration because of her viewpoint disagreement over "wokeism" (Dkt. #51 at ¶ 70). Whether or not Plaintiff can prove this is a question for another day. For now, the ongoing conduct at issue can be cured through prospective, declaratory and injunctive relief, to ensure Plaintiff has a pathway to *Emeritus* status consideration.

Accordingly, Plaintiff alleges the right remedy to maintain her official-capacity claims against Bender.

\* \* \*

For the reasons outlined above, the Court finds that Plaintiff's official-capacity claims as to West, Yardley, Tilton, Feyten, and Green are jurisdictionally barred by sovereign immunity, but

16

Plaintiff's official-capacity claims against Bender, for prospective, declaratory and injunctive relief are not subject to dismissal under Rule 12(b)(1) based on sovereign immunity.

## II.    Rule 12(b)(6)

The Court now addresses Defendants' challenges under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, qualified immunity, and collateral estoppel.

### A.    First Amendment Retaliation and Viewpoint Discrimination Claims

The Court will first determine whether Plaintiff has adequately pleaded First Amendment retaliation and viewpoint discrimination claims for which relief can be granted. The Supreme Court has "made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

To establish a First Amendment retaliation claim, a plaintiff must satisfy the following elements: (1) they suffered an adverse employment decision; (2) the speech involved a matter of public concern; (3) the plaintiff's interest in speaking outweighed the defendants' interest in promoting efficiency; and (4) the plaintiff's speech must have motivated the defendants' action. *Lowery v. Mills*, 157 F.4th 729, 741 (5th Cir. 2025). Next, under the First Amendment, "[v]iewpoint discrimination exists 'when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" *Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)).

Defendants argue Plaintiff has not stated a viable § 1983 claim for First Amendment retaliation for the following reasons: (1) Plaintiff's speech was in the course of her employment and not in her capacity as a private citizen on a matter of public concern; (2) the balancing of interests

17

strongly favors TWU's decision to suspend Plaintiff; and (3) Plaintiff has not plausibly alleged that she suffered an adverse employment action (Dkt. #59 at pp. 19–27). For these same reasons, Defendants argue Plaintiff has also failed to state a claim for First Amendment viewpoint discrimination (Dkt. #59 at p. 27).

In response, Plaintiff first argues "she exercised her First Amendment rights by speaking in her individual capacity on an issue that extends beyond personal grievance and into the realm of public discourse"—namely, "wokeism" (Dkt. #60 at p. 15). Plaintiff next argues her "right to speak freely on matters of public importance outweighs the University's interests. Merely because faculty members . . . take offense at a viewpoint they do not like, or the manner the viewpoint was expressed, does not mean that the University's interests outweigh the employee's interest in speaking freely" (Dkt. #60 at p. 20). And finally, Plaintiff contends that her "suspension and forced, constructive retirement and the interference with her ability to be fairly considered for emeritus status, individually and collectively, amount to adverse employment actions" (Dkt. #60 at p. 21).

The Court will begin by reminding the parties that it already determined the *ongoing* "adverse employment action" at issue is Bender's interference with Plaintiff's ability to be fairly considered for emeritus status and nothing else (Dkt. #51 at pp. 12–13; Dkt. #53 at pp. 3, 10). Again, on December 11, 2023, TWU's investigation concluded, and Plaintiff's committee suspension was lifted (Dkt. #51 at ¶ 67). Further, if Plaintiff wants to be fairly considered for post-retirement *Emeritus* status, Plaintiff needs to be a retired professor (Dkt. #51 at ¶ 71). She cannot, therefore, allege she was forced into a constructive retirement, but also allege she has been deprived of an honorary status a professor can only obtain if they are *retired*. In short, the ongoing adverse

employment action that the First Amendment claims address is that she has not been fairly considered for *Emeritus* status like any other similarly situated professor—without regard to her views on "wokeism" (See Dkt. #51 at pp. 12–13, 19).

The Court also finds that Plaintiff spoke as a private citizen regarding her personal opinions on "wokeness" without disrupting any university activity (Dkt. #51 at ¶ 84). The speech about "woke" ideology implicated social and political commentary, independent from her official instruction as a professor (Dkt. #51 at ¶ 35). And although Plaintiff's comments began at a faculty meeting, they were fully expressed via private electronic correspondence (Dkt. #51 at ¶ 47). The Court agrees that this disagreement may have strained Plaintiff's relationship with her eventual supervisor, Bender, but with the allegations the Court has seen, the ideological disagreement should not have justified blocking Plaintiff's nominations for *Emeritus* status consideration.

With that understanding, the Court finds—after reviewing Plaintiff's Complaint and the arguments presented in the briefs—that Plaintiff has stated plausible First Amendment retaliation and viewpoint discrimination claims for which relief can be granted under Rule 12(b)(6). Thus, dismissal of the claims is unwarranted.

### B.    Qualified Immunity

Next, the Court will determine whether Defendants are entitled to qualified immunity from Plaintiff's First Amendment retaliation and viewpoint discrimination claims. To establish liability under § 1983, a plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 678. Public officials whose positions entail the exercise of discretion may be protected by the defense of qualified immunity from personal liability. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a defendant asserts the defense of qualified immunity and has established that the alleged actions

were conducted pursuant to the exercise of his discretionary authority, the burden then shifts to the plaintiff to rebut this defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).

Courts have historically conducted a two-pronged analysis to determine whether a defendant is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, courts must determine whether a "constitutional right would have been violated on the facts alleged." *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004). Second, courts must determine whether "the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* The Supreme Court instructs district courts "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, beginning with the first question—whether the official violated a constitutional right—Plaintiff alleges Defendants violated the First Amendment by retaliating against her protected speech and discriminating against her based on her "anti-wokeness" ideology. Defendants argue Plaintiff has not sufficiently alleged how each individual Defendant, through his or her individual actions, violated her First Amendment rights (Dkt. #59 at p. 30). Defendants admit that in the Complaint, Plaintiff does allege West, Yardley, Tilton, Fetyan, and Green played some role or supervisory role in her prior suspension; however, as stated above, this conduct revolving around Plaintiff's prior suspension, which was lifted, is no longer at issue (Dkt. #59 at pp. 30–31; Dkt. #53 at pp. 3, 10). Moreover, in her Response, Plaintiff admits that, other than Bender, Defendants do "not have a direct role in the emeritus nomination and voting process" (Dkt. #60 at p. 31). Because Plaintiff has not alleged her constitutional rights were violated by West,

Yardley, Tilton, Feyten, and Green, the Court agrees that West, Yardley, Tilton, Feyten, and Green are entitled to qualified immunity as to Plaintiff's individual-capacity claims. *Flores*, 381 F.3d at 395.

As for Bender, Plaintiff avers Bender can "block and has blocked" Plaintiff's nomination for *Emeritus* status consideration because of her ideological disagreement over "wokeism" (Dkt. #51 at ¶ 70). For the reasons stated in the previous section, these allegations, if proven true, constitute a constitutional violation. Thus, Plaintiff has met the first prong of the qualified immunity analysis as it relates to her individual-capacity claims against Bender.

Thus, the Court proceeds with the second question—whether Bender violated clearly established law that constitutes First Amendment retaliation and viewpoint discrimination. "The § 1983 plaintiff bears the burden of proof." *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019). The law is established if a reasonable official would understand that their conduct violates the asserted right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of the right [are] sufficiently clear" such that every "reasonable official would have understood that what he is doing violates that right." *Id.* at 640. The clearly established inquiry does not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. *See id.* Finally, the "law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Anderson v. Valdez*, 845 F.3d 580, 600 (5th Cir. 2016).

### 1.    Plaintiff's Retaliation Claim

The Court begins with Plaintiff's First Amendment retaliation claim. Here, Bender is entitled to qualified immunity unless it was clearly established that the alleged retaliatory

conduct—namely, blocking a retired professor's nominations for *Emeritus* status consideration based on her professed position on "wokeism"—constituted retaliation under First Amendment precedent at the time of the challenged action.

Plaintiff directs the Court to *Burnside v. Kaelin*, 773 F.3d 624, 629 (5th Cir. 2014), in which the Fifth Circuit found the defendant was not entitled to qualified immunity at the motion-to-dismiss stage against the plaintiff's § 1983 action for First Amendment retaliation (Dkt. #60 at p. 29). In that case, the plaintiff, a former deputy sheriff, alleged he experienced a retaliatory, demotion-like transfer following his non-endorsement of the sheriff, the defendant, during the defendant's re-election campaign, in violation of his First Amendment right of free speech and association. *Id*. at 628. The Fifth Circuit provided its analysis for each of the elements of a First Amendment retaliation claim, beginning with its finding that the plaintiff alleged his transfer was an adverse employment action. *Id*. at 628–29 (citing *Click v. Copeland*, 970 F.2d 106, 113 (5th Cir. 1992) (holding that a transfer from law enforcement to jail guard was like a demotion and constituted an adverse employment action because it was less interesting, less prestigious, and provided less opportunity for promotion).

As for the second element, it was undisputed that the plaintiff's non-endorsement comments were a matter of public concern. *Id*. at 627. The comments were also made directly to the defendant in a private capacity. *Id*. With respect to causal link element, the Fifth Circuit found the former deputy sheriff's allegations were "sufficient to allow a plausible inference that [the defendant] knew of the non-endorsement before he initiated [the plaintiff's] transfer and that the non-endorsement caused the jail-duty transfer." *Id*. at 628. Finally, the Fifth Circuit stated there is rebuttable presumption that a plaintiff's interest in speaking on matters of public concern

outweighed the defendants' interest in promoting workplace efficiency, and Defendant did not overcome that presumption. *Id*. The Court found "the law is clearly established that such a retaliatory action, if proved, violates the First Amendment" and affirmed the district court's denial of qualified immunity for the defendant based on the plaintiff's transfer. *Id*.

Although there are notable factual distinctions between *Burnside* and the instant case, the Court finds it gives a reasonable university official warning that it is unconstitutional to interfere with professor's nomination for *Emeritus* status consideration because of her speech. The circumstances in *Burnside* are analogous to those in this case. Here, the Court has already determined the ongoing adverse employment action at issue is Bender's purported interference with Plaintiff's *Emeritus* status consideration, which is similar to *Burnside* where the defendant initiated plaintiff's transfer (Dkt. #60 at pp. 25, 29). 773 F.3d at 628. Further, like the *Burnside* plaintiff's non-endorsement comments were made directly to defendant in a private setting, Plaintiff spoke on a matter of public concern as a private citizen to Bender without disrupting any university activity (Dkt. #51 at ¶ 84). "Woke" ideology, as Plaintiff explains it, is "being alert to and concerned about social injustice and discrimination" (Dkt. #51 at ¶ 35). As stated in the previous section, the Court finds that the discussion between Plaintiff and Bender, which began at a faculty meeting and then progressed via electronic correspondence, related to a matter of political and social concern, similar to the *Burnside* plaintiff's non-endorsement comments. 773 F.3d at 628. Finally, like the *Burnside* plaintiff who was transferred *after* making his non-endorsement comments, Plaintiff alleges her nomination was blocked *after* she expressed her position on "wokeism" ideology to Bender, thereby establishing a plausible inference of a causal link between her speech and Bender's conduct (Dkt. #51 at ¶ 71). Thus, the Court agrees that *Burnside* places

the question of the unconstitutionality of a university officials' conduct "beyond debate." *Anderson*, 483 U.S. at 640.

Notably, Defendants do not attempt to distinguish *Burnside*, but Defendants do contend Plaintiff cannot "point this Court toward any binding precedent suggesting that the delayed or non-granting of an honorific like *emeritus* status constitutes an adverse employment action" (Dkt. #59 at p. 26). This argument misses the mark because Plaintiff does not allege she is entitled to *Emeritus* status as a matter of right. Instead, the adverse employment action at issue is Bender's purported refusal to fairly consider any nomination recommending Plaintiff for the honorary *Emeritus* status. *See Burnside*, 773 F.3d at 628 (finding an adverse employment action where the new position is less interesting, less prestigious, and provides less opportunity for promotion).

Lastly, taking Plaintiff's factual allegations as true at this stage, Bender's action in blocking Plaintiff's nomination for *Emeritus* status consideration after she expressed her position on "woke" ideology violated Plaintiff's First Amendment rights as a professor—which any reasonable university official would have known. For now, because the Court cannot find that Bender's conduct was objectively reasonable, Bender is not entitled to a qualified immunity defense as to Plaintiffs' individual capacity retaliation claim. Accordingly, Plaintiff's § 1983 claim for First Amendment retaliation against Bender in her individual capacity survives dismissal.

### 2. Viewpoint Discrimination Claim

The Court proceeds with Plaintiff's First Amendment viewpoint discrimination claim. Here, Bender is entitled to qualified immunity unless it was clearly established that the alleged discriminatory acts—namely, blocking a retired professor's nominations for *Emeritus* status consideration based on her professed position on "wokeism"—constituted viewpoint discrimination under First Amendment precedents at the time of the challenged conduct.

24

Again, for this claim, Plaintiff has the burden to point out the clearly established law. *Morrow*, 917 F.3d at 870. Plaintiff has not directed the Court to any binding authority where a viewpoint discrimination claim was upheld for facts analogous to the ones at issue in this case. Although Plaintiff cited *Burnside*, that case did not involve a viewpoint discrimination claim. 773 F.3d at 628–29. Thus, considering the conduct at issue, Plaintiff has not shown that her claim for viewpoint discrimination rests on clearly established law.

Accordingly, Plaintiff's § 1983 claim for First Amendment viewpoint discrimination against Bender in her individual capacity will be dismissed.

### C.    Collateral Estoppel

Finally, the Court will consider Defendants' argument that collateral estoppel bars Plaintiff's First Amendment claims. In their Motion, Defendants acknowledge the Court's February 18 Memorandum Opinion and Order, in which Defendants were advised the Court would not consider an argument that Plaintiff's claims are barred by collateral estoppel at the 12(b)(6) stage (Dkt. #42 at p. 41). However, the Court need not rely on a collateral estoppel affirmative defense to agree with some of Defendants' arguments. Plaintiff's Complaint contains carryover allegations relevant only when the challenged action was Plaintiff's suspension, removal from faculty committees, and other professorial duties. For example, Plaintiff asserts "[u]nless the suspension is enjoined and [Plaintiff] is returned to her position as a fully tenured professor with teaching and committee roles, she will continue to suffer irreparable injury" (Dkt. #51 at ¶ 78). The Court has already addressed this issue—the only alleged ongoing adverse employment action is Plaintiff's inability to be fairly considered for *Emeritus* status. As to this specific conduct only, Plaintiff's First Amendment claims as to some of the Defendants will continue past the pleading stage.

## CONCLUSION

It is therefore **ORDERED** that Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint (Dkt. #59) is hereby **GRANTED in part** and **DENIED in part**.

Specifically, the Court **ORDERS** as follows:

1.    Plaintiff's request for a declaratory judgment against West, Yardley, Tilton, Feyten, and Green, in their official capacities, is **DISMISSED without prejudice**;

2.    Plaintiff's request for injunctive relief against West, Yardley, Tilton, Feyten, and Green, in their official capacities, is **DISMISSED without prejudice**;

3.    Plaintiff's request for declaratory judgment and injunctive relief against Bender, in her official capacity, will remain and relate only to the alleged retaliatory and discriminatory conduct that Plaintiff has been unable to be fairly considered for *Emeritus* status at TWU;

4.    Plaintiff's request for nominal damages against West, Yardley, Tilton, Feyten, and Green, in their individual capacities, is **DISMISSED without prejudice**;

5.    Plaintiff's request for nominal damages against Bender, in her individual capacity, will remain and relate only to the alleged First Amendment retaliation claim; and

6.    Any requests to enjoin Defendants to lift Plaintiff's prior suspension and have her return to her position as a fully tenured professor with teaching and committee roles are **DISMISSED with prejudice**.

It is further **ORDERED** that the remaining parties file a proposed joint scheduling order within fourteen (14) days of this Order.

**IT IS SO ORDERED.**

**SIGNED this 30th day of January, 2026.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE